SERVIDONE CONSTRUCTION
CORPORATION, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 282–84C.

United States Claims Court.

June 28, 1990.

Gregory D. Ronan, New York City, for plaintiff.

Helene M. Goldberg, Washington, D.C., with whom were Asst. Atty. Gen. Stuart M. Gerson and David M. Cohen, for defendant. William Brown, Corps of Engineers, of counsel.

## ORDER ON ATTORNEY FEES, EXPENSES AND COSTS

BRUGGINK, Judge.

This litigation arose out of a contract between the United States Army Corps of Engineers ("Corps") and Servidone Construction Corporation ("Servidone"), for completion of an earthen dam near Dallas, Texas. The action was brought under the Contract Disputes Act, 41 U.S.C. §§ 601–613 (1982). Plaintiff sought the total amount of $41,877,029. The largest claim, involving embankment work, was based on allegations of a differing site condition, and on defective specifications. On February 2, 1990, judgment was entered for plaintiff in the amount of $14,441,123. The action is presently before the court on plaintiff's application, pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412

(1988), for attorney fees and expenses in the amount of $2,484,055.73, and on defendant's opposition to plaintiff's bill of costs. For the reasons set out below, the application for fees and expenses is denied in most respects, and the bill of costs is allowed in part.

### 1. The application for fees and expenses

The EAJA directs a court to award "fees and expenses" to certain parties who prevail in litigation against the United States. To establish entitlement, the act requires: (1) that the claimant be a prevailing party; (2) that the Government's position was not substantially justified; (3) that no special circumstances make the award unjust; and (4) that the fee application be timely submitted and properly supported. *Commissioner v. Jean,* — U.S. —, —, 110 S.Ct. 2316, 2317, 110 L.Ed.2d 134 (U.S. June 4, 1990). The only entitlement issue raised by defendant's opposition to the fees is whether defendant has demonstrated that its position was substantially justified. Defendant also contends that, even if its position was not substantially justified, the application is unsupported in its request for an enhanced hourly rate, in its itemization of certain fees, and with respect to certain expenses and expert fees claimed.

In *Pierce v. Underwood,* 487 U.S. 552, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988), the Court clarified the meaning of the term "substantially justified," used by Congress to limit the circumstances in which fee shifting would be required. The Court opted for the following definition:

> "justified in substance or in the main"—that is, justified to the degree that could satisfy a reasonable person. That is no different from the "reasonable basis both in law and fact" formulation adopted by the Ninth Circuit and the vast majority of other Courts of Appeals that have addressed this issue.

*Id.* at 565, 108 S.Ct. at 2550. The more stringent "justified to a high degree" test was thus rejected. *Id.*

█ In its application and in its reply brief, plaintiff relies in part on the argu-

ment that the agency's conduct prior to litigation was unjustified. It points to the facts that no contracting officer's decision was ever rendered, and on the agency's failure to "seriously" pursue settlement. Servidone suggests that if the agency's conduct was unreasonable prior to litigation, that is sufficient basis to reject defendant's contention that its position was substantially justified within the meaning of the EAJA. Plaintiff relies in part on the recent Supreme Court decision in *Commissioner v. Jean*, 110 S.Ct. 2316. The question addressed by the Court in that case was whether a prevailing party is ineligible for fees incurred in litigating the question of attorney fees if the Government's position on that aspect of the dispute was substantially justified. The Court concluded that only one threshold determination concerning justifiability of the Government's position should be made. *Commissioner v. Jean*, 110 S.Ct. at 2317. From this, Servidone argues that, because the Government's conduct at the agency level was unreasonable, it follows that plaintiff is entitled to fees. The court disagrees.

In *Essex Electro Engineers, Inc. v. United States*, 757 F.2d 247 (Fed.Cir.1985), the trial court had determined, in finding liability, that the agency's conduct was irrational and arbitrary. *See* 4 Cl.Ct. 463 (1984). In asking for attorney fees, plaintiff took the position that, *a priori*, the Government's position was not substantially justified. The Federal Circuit rejected that view, and held that "the merits of the agency decision constitute only one factor in evaluating the justification for the Government's litigating position in court." 757 F.2d at 253. This analysis is fully consistent with *Commissioner v. Jean*, and has application here. The court will make a single determination of the justifiability of the Government's position, taking into account both the agency's conduct and actions before the court. The court considers the agency's conduct in this instance to be of relatively less importance, however. The lawsuit did not generate a great deal of information about how the agency handled the claim, other than to disclose that there was apparently no interest in settle-ment, and little regard for the merits of plaintiff's assertions.

Servidone points to the fact that the Contracting Officer did not issue decisions on the claims submitted by plaintiff. That is an eventuality specifically contemplated by the Contract Disputes Act, however. *See* 41 U.S.C. § 605(c)(5). The claim with respect to embankment work, by far the most substantial one, was presented on March 1, 1984. The claim was for over $13 million and was 41 pages long. To say that the embankment claim would raise difficult questions, particularly in the midst of contract performance, is an understatement. The court notes that Servidone contended that it had been ordered to do extra work, and that the extra work constituted a cardinal change in the contract. An allegation of a cardinal change is a suggestion that the contract has been breached; that the work is a drastic modification beyond the original agreement. *Air–A–Plane Corp. v. United States*, 187 Ct.Cl. 269, 408 F.2d 1030, 1033 (1969). That argument was rejected after trial, but given its seriousness in the midst of the ongoing work, it is not surprising that the Contracting Officer was unable or unwilling to issue a decision within the statutory time period necessary to ripen appeal rights. Plaintiff filed its complaint on June 4, 1984.

The reasonableness of the Government's settlement posture is peculiarly difficult to assess, and is best considered in light of the Government's ability to justify its litigating position at trial.

Defendant argues that a number of factors demonstrate that its litigating position was substantially justified. Initially, it correctly observes that Servidone sought to recover a total of nearly $42 million, not including statutory interest. It was awarded a judgment for $14,441,123, not including interest. The fact that Servidone only recovered a third of what it sought does not, of course, mean that defendant's position was necessarily substantially justified. In this case, however, the reduced recovery is a reflection of plaintiff's lack of success on several individual claims, and of the fact that a differing site condition as to the

embankment claim was limited to the difference between a reasonable bid, and plaintiff's recoverable costs.

The complaint asserted eight claims other than the embankment claim. Servidone was successful only as to two. The Government's position prevailed, and was certainly substantially justified, as to: 1) the harassment and overtesting claim; 2) the rework claim; 3) the inundation claim; 4) the standby claim; 5) the mobilization claim; and 6) the interest claim.

As to the lime stabilized subgrade claim, the court reduced Servidone's recovery slightly because defendant established that part of the plaintiff's difficulty in obtaining compaction was due to the mineral content of the slurry water used. Servidone was responsible for assuring that the water did not affect the function of the lime. This aspect of defendant's defense to the claim was relatively minor, however, and came late in the day. Difficulties with water content were more in the nature of a scientific post-mortem than a contemporaneous reason for refusing to pay the claim. The justifiability of defendant's position on the lime work depends on the Government's position more generally as to all the embankment work. This claim will be considered in that context, accordingly.

■ The Mountain Creek II claim was uncontested at trial. Defendant had, during construction, agreed to grant a request for a change order involving virtually an identical claim as to the first half of work on dredging and refilling Mountain Creek. The Government offered no defense to Servidone's contention that it was necessary to excavate beyond the level shown in the contract drawings in order to reach firm soil. It should not have been necessary to litigate this claim. The Government's position was therefore not substantially justified. Determination of how much Servidone should recover in terms of attorney fees will be addressed later in this opinion.

■ By far the majority of effort expended by the attorneys, the experts and the court involved the embankment claim, which was advanced as both a Type I and Type II differing site condition claim, and

as a claim for defective specifications. Although Servidone ultimately prevailed in terms of a Type II differing site condition, this was only after a number of unsuccessful theories and arguments were rejected. A great deal of trial time was devoted to plaintiff's presentation of a Type I differing site condition claim. That claim had two elements, express contract indications and implied contract indications. Servidone challenged two aspects of the express terms of the contract. The first was the agreement's indication of moisture levels. A large portion of the testimony of Joseph Fantozzi and one of plaintiff's experts, George Sowers, was devoted to making the argument that there was inconsistency between the contract moisture indications and conditions actually experienced. That argument was rejected by the court with very little difficulty. It is important to note in this regard that one of the apparent foci of the embankment claim was excess water. Servidone contended that there was an unusual amount of precipitation, which caused flooding problems and elevated moisture levels in the borrow areas. By the time of trial, Servidone's strategy had shifted. It withdrew the argument that the amount of rainfall was beyond the levels indicated in the contract. It argued instead that the soil reacted in an unusual way with the water, and that the Government's culvert design trapped flood waters. In its opinion, the court also rejected these flooding-related claims. Given the importance of the rainfall and flooding allegations to the embankment claim, and to their ultimate lack of vindication, it can hardly be argued that the Government, either at the agency level or at trial, was unjustified in rejecting Servidone's analysis.

In the nearly six weeks of trial time, two subjects predominated. The primary one was the nature of the soil—whether a reasonable contractor could have anticipated the difficulty of working the soil. An issue of almost equal weight in terms of trial effort was the reliability of the liquid limit correlation curve, an element of Servidone's Type I differing site condition claim. Both parties devoted a great deal of factual

testimony and expert analysis to this issue. A survey of the parties' post-trial briefing reflects that nearly a third of the text in the briefs is taken up with the curve. Servidone's numerous assaults on the curve were rejected in the court's opinion, however, and in fact the court found that Servidone personnel were less than reasonable, when confronted with the curve in bidding documents, in making assumptions about its operation. A similar analysis was used in rejecting Servidone's claim that use of the liquid limit correlation curve made the specifications defective. While the effort expended by the parties in addressing the curve was useful in some respects in understanding the nature of the soil in connection with the successful Type II differing site condition claim, that phenomenon underscores the virtual impossibility, discussed below, of differentiating the justifiability of defendant's positions as to Servidone's multi-faceted approach to liability.

Servidone's contentions with respect to implied contract indications, while not rejected outright, were treated as part of the Type II differing site condition analysis.

The largest single allocation of litigation resources went to presentation and refutation of the Type II claim. Plaintiff put on a great deal of convincing factual and expert evidence in support of this claim. It was more than sufficient to persuade the court that the condition of the soil satisfied the elements of a differing site condition claim. Arriving at that result, however was by no means self-evident. Defendant made a number of credible arguments. There was some evidence, albeit admittedly not extensive, that Servidone's difficulties were exaggerated. There was testimony about Servidone's excavation and compaction practices which, when taken in gross, created an issue as to whether some of the problems were due to such things as unnecessary delay, over-wetting, ramps which were too steep, poor use of scrapers, or poor supervision. The court found none of them persuasive in isolation, but it was not unreasonable for defendant, with some credible evidence, to advance those arguments. Defendant also was not unreasonable in contrasting the soils encountered in construction of other dams in the north Texas area. The court accepted defendant's premise that those dams formed a legitimate point of comparison, as opposed to soils in different parts of the country. Although that evidence ultimately helped confirm the uniqueness of the soil encountered by plaintiff, there were sufficient similarities to raise an issue as to whether conditions at the Joe Pool reservoir were really different. Defendant also offered the testimony of Richard Barth, an experienced contractor. The court utilized that testimony in developing an understanding about how a reasonable contractor would have bid.

One of the most troublesome issues addressed by both parties was the degree to which a reasonable contractor would have anticipated the difficulties encountered, based on contract indications of the plastic limit, liquid limit, moisture content, and, indirectly, the plasticity index. The court held that data as to those variables was some indication of toughness of the soil. Defendant was substantially justified, particularly in light of other decisions relying on those variables, and in light of the testimony of Barth and of James Sears, the Government's estimator, in arguing that there were sufficient indicia to preclude recovery. The court ultimately rejected defendant's argument that the precise character of the soil should have been anticipated based on those indicators. It concluded that they are only some measure of toughness, and that in this case the soil was so unusual that even those factors were insufficient warning. It agreed with defendant, however, that a reasonable and prudent contractor would have had more understanding of the implications of elevated Atterberg factors than did Servidone. It was only with respect to the more sophisticated manipulation of that data (the A-line U-line analysis, for example, which was the most precise indicator) that the court found that plaintiff was reasonable in its ignorance.

Defendant also was justified in arguing that Servidone's preparation of its bid was unreasonable. The court criticized plain-

tiff's site visit, and accepted, in part, defendant's contention that Servidone was imprudent in not exhibiting more curiosity about soils in the area. It ultimately agreed with defendant that Servidone was not completely reasonable in the way it prepared its bid, primarily for acting in the face of a lack of understanding about the liquid limit correlation curve and the elevated Atterberg indicators.

In sum, defendant advanced several legitimate defenses to the embankment claim. Even those not accepted by the court were supported by credible factual or expert testimony and legal pedigree. This court has considered such factors in finding the Government's position substantially justified. *See, e.g., Cox Constr. Co. v. United States*, 17 Cl.Ct. 29, 33 (1989) (credible testimony of three experts supported one claim); *Babenco Devel. Corp. v. United States*, 15 Cl.Ct. 637, 640 (1988) (genuine issues of material fact as to each claim).

One additional factor weighs on the side of denying fees and expenses in this case. That concerns the relative lack of precision with which the embankment claim was presented. From the time the embankment claim was submitted, through trial, it was obvious that Servidone was offering a number of possible explanations for its problems. The theories were interrelated, and they waxed and waned at various points in the litigation. In addition, in filing its complaint, Servidone fractured out of the original embankment claim several issues, which although separately articulated in the complaint, were never clearly segregated at trial. The court has reference to the harassment and overtesting claims, the rework claims, and the inundation claim, with its various expressions. It is obvious that Servidone, in submitting its original embankment claim to the Contracting Officer, and in presenting its case at trial, was groping to some extent for an understanding of why it encountered the problems it did at Joe Pool Reservoir. It is understandable, given the complexity of the natural phenomena and the scale of the project, that plaintiff would be as comprehensive as possible. It also becomes more understandable, however, that defendant

was less than flexible in its litigation posture. Plaintiff fired a shotgun, and only some of the pellets hit the target. Enough went astray that defendant was not unjustified in its positions, both at the agency level and before this court.

■ Because the court has found the Government's position not substantially justified as to the Mountain Creek II claim, it becomes necessary to consider an award for fees and expenses in that regard. The appendices to the application for fees and expenses do not permit isolation with respect to this claim. Of the $349,447 sought for this work, the court allowed $196,605.58. This represents 1.3% of the total recovery, before calculation of interest. In *Esprit Corp. v. United States*, 15 Cl.Ct. 491, 493–94 (1988), the court applied a percentage obtained in this way against the allowable fees and expenses. In *Cox Constr. Co.*, the court, relying on the admonition in *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983), that attorney fees should not become a second level of litigation, emphasized that, when determining fees and expenses for portions of the amount sought, practical considerations are important. 17 Cl.Ct. at 33. Mindful of these precedents, the court addresses Servidone's entitlement on this claim.

Very little attention was given to the Mountain Creek II claim at trial. It was the subject of attention by two of plaintiff's witnesses, Larry Fantozzi, and Craig Jacobsen, plaintiff's accounting expert. The claim was not the subject of any legal analysis. It was, however, prepared with assistance of counsel and, because the Government declined to make any payment, had to be the subject of proposed findings of fact, testimony, and post-trial briefing.

Plaintiff claims a total of $1,681,129.36 in attorney fees, calculated at actual rates ranging up to $200 per hour. Defendant urges that fees be limited to the $75 rate provided for in the EAJA, although it concedes that a cost of living adjustment may be appropriate. If billed at an adjusted

EAJA rate, Servidone would claim a total of $913,652 for fees. With respect to Jacobsen's billings, the defendant urges that his charges be limited to the hourly rate recommended for use by the Department of Justice in its contracting with experts. This would limit the amount actually claimed ($594,224) to $558,565. Regardless of what adjustments, if any, the court might make if defendant's position had not been substantially justified as to more complex claims, the court is of the view that it should take into account the adjusted rates for both counsel and Jacobsen as to the Mountain Lake II claim. It is also unnecessary, given the lack of complexity of the issue, the absence of non-accounting expert testimony and the virtual lack of documentary evidence, to assess other expenses. The sum of attorney fees calculated at an adjusted EAJA rate and Jacobsen's fees capped at the recommended level is approximately $1,472,217. In the court's view, a total amount of $35,000 for fees and expenses is appropriate as to the Mountain Creek II claim.

2. The bill for costs

Rule 54(d) RUSCC permits the court to assess costs against the United States, "to the extent permitted by law." The relevant law is found in two code provisions. Section 2412(a) of title 28 provides in part that "a judgment for costs, as enumerated in section 1920 of the title ... may be awarded to the prevailing party in any civil action brought against the United States." 28 U.S.C. § 2412(a) (1988). In turn, 28 U.S.C. § 1920 limits recovery to six enumerated cost items.

█ Servidone has submitted an itemized, documented bill of costs. Defendant challenges three aspects of the bill. First, it disputes whether certain of the transcript expenses meet the statutory requirement that they be "necessarily obtained for use in the case." 28 U.S.C. § 1920(2). Servidone is seeking reimbursement for $9,895.28 paid for trial transcript copies.

Defendant contends, and plaintiff does not deny, that some of the transcript was ordered on an expedited basis, at a cost of $8.80 per page. This was not daily copy, and was apparently limited to the testimony of Dr. Steven Poulos and Thomas Schmidt, taken during a two-week segment of the trial held in Dallas, Texas. Defendant contends that an expedited copy was not necessary within the meaning of the statute.

Courts have allowed winning parties to recover transcript costs at a daily or an expedited rate, although the only decisions encountered by the court involved a defendant other than the United States. *See, e.g., Galella v. Onassis, C.A.,* 487 F.2d 986 (2d Cir.1973); *Independence Tube Co. v. Copperweld Corp.,* 543 F.Supp. 706 (N.D. Ill.1982); *Brager & Co. v. Leumi Securities Corp.,* 530 F.Supp. 1361 (S.D.N.Y. 1982), *aff'd,* 697 F.2d 288 (2d Cir.1982); *United Rubber, Cork, Linoleum & Plastic Workers v. Lee Nat'l Corp.,* 62 F.R.D. 194, 196 (S.D.N.Y.1974); *Kaiser Ind. v. McLouth,* 50 F.R.D. 5 (E.D.Mich.1970). The Government argues that applying the same potential liability to it under section 2412(a) would abrogate the principle of sovereign immunity. The court disagrees. The amendments to section 2412 which brought about potential liability for these costs on the part of the United States were adopted in 1980,* well after a jurisprudence had developed around section 1920. In any event, the court sees the issue, not as one of statutory construction, as urged by defendant, but of fact. Congress gave the trial court the responsibility for determining whether the claimed costs were "necessarily" incurred. In making that determination, the court sees no practical distinction between lawsuits against the sovereign and those between private litigants. The relevant parameters are those involving litigation dynamics, which transcend concerns about the nature of the parties. *See, e.g., Galella,* 487 F.2d at 999 (size of claim, witness credibility); *Independence Tube Co.,* 543 F.Supp. at 719–20 (length,

---

* Act effective Oct. 1, 1981, Pub.L. No. 96–481, 94 Stat. 2327, 2329 (codified as amended at 28 U.S.C. § 2412).

complexity and importance of pretrial proceedings); *Brager & Co.*, 530 F.Supp. at 1366 (complexity of case, length of trial); *Lee Nat'l Corp.*, 62 F.R.D. at 196 (need to be able to cross-examine experts on precise wording of direct testimony); *Kaiser Ind.*, 50 F.R.D. at 8–9 (length and complexity of trial).

In assessing whether expedited transcripts were necessary, a factor of reasonableness must be implied. The court has to give some deference to the litigation determinations made, in this case, by highly competent counsel. In that assessment, the court will give primary weight to circumstances at the time of trial. In this instance, the court agrees with plaintiff that it was necessary to obtain expedited transcripts for use in the case. Trial in this action was split between Washington, D.C. and Dallas. The first phase and last phase were in Washington. The middle portion was in Dallas. There were only brief delays between the three phases. One reason advanced by plaintiff for expedited transcripts is that the Government's primary soils expert, Dr. Poulos, and its primary design witness, Thomas Schmidt, testified during the Dallas portion of the trial, and at a time when plaintiff's primary soils and design expert, George Sowers, could not attend. There was insufficient time prior to Sower's rebuttal to obtain a transcript within the normal time for delivery. In addition, given the total length of time between start and completion of trial, the complexity of the issues, and the absence of Sowers, it is hardly remarkable that plaintiff felt it necessary to have certain key portions of the testimony available before the trial ended. Servidone's transcript costs are therefore allowed in full.

■ Defendant also challenges costs claimed for witness fees and expenses. It correctly points out that 28 U.S.C. § 1821 places limits on the subsistence and travel expenses of witnesses. The former may not exceed the maximum per diem for federal employees, § 1821(d), and the latter is limited to the "most economical rate reasonably available." § 1821(c)(1). In addition, witness fees are limited to $30 per day

for days on which travel or attendance is necessary. § 1821(a)(2). Plaintiff does not disagree with defendant's contentions that the original bill exceeded amounts allowable for subsistence and witness fees. It has accordingly reduced the amount claimed for those items and for travel from $15,107.05 to $10,908, which the court allows.

■ Servidone also claims $11,806.42 for "exemplification or duplication of papers necessarily obtained for use in the case," in reliance on § 1920(4). Of that amount, $10,524.62 relates to the production of visual aids, charts and binders. There is no question that these materials were used at trial, and were helpful to plaintiff and the court. The question, however, is whether they are recoverable under § 1920(4). If they are not, then their utility is not relevant. It is obvious that the challenged amounts do not represent amounts spent on exemplification (legal certification or attestation) or duplication. Plaintiff concedes as much in its reply brief by relying on the argument that the materials were useful in presenting the evidence. Servidone's reference to 10 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 2677 at 369 (2d ed. 1986) is inapposite. As the writers point out with reference to the costs of preparing charts and exhibits: "an item of the kind listed above is not expressly covered by Section 1920 and its cost will be taxed only if the court chooses to exercise its power to do so ..." Whatever may be a court's powers to exercise such discretion in litigation against a private party, in this instance, defendant's concern with sovereign immunity is well-taken. As the Federal Circuit taught in *Fidelity Constr. Co. v. United States*, 700 F.2d 1379, 1387 (Fed.Cir.), *cert. denied*, 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 103 (1983): "In construing a statute waiving the sovereign immunity of the United States, great care must be taken not to expand liability beyond that which was explicitly consented to by Congress...." Since there has been no explicit allowance within § 1920 for the type of costs challenged, they are disallowed. Accordingly, Servidone's bill of costs with respect to

costs for exemplification and duplication is reduced by $10,524.62. $1,281.80 is allowed.

### CONCLUSION

Plaintiff is allowed attorney fees and expenses in the amount of $35,000. It is allowed costs in the amount of $34,090.38. The Clerk is directed to enter judgment accordingly.