**BURNSIDE–OTT AVIATION TRAINING CENTER, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 90–3880C.

United States Claims Court.

Nov. 27, 1991.

Harvey G. Sherzer, Washington, D.C., for plaintiff.

Deborah A. Bynum, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant.

## AMENDED ORDER

MOODY R. TIDWELL, III, Judge.

This case is before the court on defendant's motion to dismiss the complaint under RUSCC 12(b)(1) for lack of subject matter jurisdiction, and under RUSCC 12(b)(4) for failure to state a claim upon which relief can be granted. For the reasons stated below the court will consider Counts IV and V under defendants RUSCC 12(b)(4) motion as a motion for summary judgment because the 12(b)(4) motion was presented with matters outside of the pleadings and not excluded by the court. *See* RUSCC 56.[1]

### FACTS

On January 19, 1981, the Navy solicited proposals for a contract (Contract I) for helicopter maintenance services at Whiting Field Naval Air Station, Florida. The solicitation and resulting contract incorporated Wage Determination 81–77 (WD 81–77), issued by the United States Department of Labor under the Service Contract Act of 1965, as amended.[2] Wage Determination 81–77, which applied to the geographic area including Whiting Field, listed the following employee classifications: aircraft mechanic, aircraft worker, mechanic helper, supply clerk/material clerk, secretary, typist, and three categories of technicians. On September 29, 1981, the Navy awarded Contract I to Burnside–Ott, which employed a substantial number of technicians to fulfill the contract. During plaintiff's performance of Contract I, the Department of Labor issued revisions to WD 81–77 which increased the wage rates that plain-

---

1. At the outset of the briefing process on defendant's motion to dismiss, the parties were informed that the court would consider the RUSCC 12(b)(4) motion as a motion for summary judgment. Plaintiff requested, and was allowed, limited discovery to respond to the motion for summary judgment. RUSCC 56(g).

2. A wage determination specifies the minimum wage a contractor must pay different classes of service employees, and reflects the prevailing rates for those classes in a particular location.

tiff was required to pay its employees. For each wage rate revision made by the Department of Labor, the Navy amended Contract I and reimbursed Burnside–Ott the full amount of its increased wage costs. Thereafter, the contract was extended for several years at the option of the government.

A solicitation for a second helicopter maintenance contract (Contract II), the successor to Contract I, was issued by the Navy in April 1984. The second solicitation and contract incorporated WD 81–77 (Rev. 5), and was awarded to Dynalectron Corporation. Dynalectron's work force under Contract II was organized in the same manner as was Burnside–Ott's under Contract I.

In September 1984, the Navy submitted to the Department of Labor a "Notice of Intention to Make a Service Contract" in anticipation of entering into a third contract (Contract III or the base year contract) to perform the same helicopter maintenance services at Whiting Field. The Navy's submittal, made on Standard Form 98–A, listed the labor classifications the Navy believed would be necessary to perform the contract, and did not include a classification for technicians. On March 7, 1985, a revised wage determination which applied to Whiting Field, WD 81–77 (Rev. 6), was issued by the Department of Labor. The nine employee classifications and the descriptions of the classifications in WD 81–77 (Rev. 6) were identical to those in previous versions of WD 81–77 applicable to Contracts I and II, including the technician classifications. In April 1985, the Navy issued a Request for Proposals for Contract III which incorporated WD 81–77 (Rev. 6). That contract was a fixed-price

requirements contract containing a one-year base period, and four one-year option periods. Contract III, the contract now before the court, was awarded to Burnside–Ott.

Burnside–Ott began performance of Contract III on December 1, 1985. Shortly thereafter, certain of Burnside–Ott's employees filed a complaint with the Department of Labor protesting their classification as technicians. As a result, the Department of Labor sent an official to Whiting Field to investigate. Following the investigation, the Navy, acting at the direction of the Department of Labor, instructed Burnside–Ott to submit a request for conformance of employee classifications in WD 81–77 (Rev. 6).[3] Burnside–Ott submitted its conformance request to the Navy in two parts; on May 20, 1986 and June 20, 1986.

In preparing to award the first option year of Contract III to Burnside–Ott, the Navy, on May 29, 1986, submitted another SF 98–A to the Department of Labor which again listed the labor classifications that the Navy believed could be used by Burnside–Ott during the option year. As in the first SF 98–A for Contract III the Navy did not recommend inclusion of a classification for technicians. Without regard to, and entirely unconnected with the pending investigation under WD 81–77 (Rev. 6), the Department of Labor, on July 8, 1986, issued two new wage determinations applicable to the geographic area including Whiting Field. The new wage determinations, WD 81–1143 (Rev. 1) and WD 85–1248 (Rev. 1), replaced WD 81–77 (Rev. 6). The new wage determinations increased the wages for all classifications of employees but did not include a labor classification for

---

**3.** A conformance request is a document prepared by a contractor proposing how its employee's wages and classifications should be adjusted when the wage determination included in a contract omits one or more classifications of service employees that the contractor intends to employ under the contract, or when the employee's actual duties or skills do not fit within one of the listed classifications. In the latter situation, the contractor must classify the employee(s) so as to provide a reasonable relationship between his or her duties and skills, and the

classifications described in the wage determination. The contracting officer attaches the contracting agency's recommendations to the conformance request and forwards it to the Wage and Hour Division of the Department of Labor. The Administrator of the Wage and Hour Division of the Department of Labor makes a final determination of which employee classifications and wages are appropriate and approves, modifies, or rejects the requested classifications and rates.

technicians. Thereafter, on July 25, 1986 the Navy forwarded Burnside–Ott's conformance request under WD 81–77 (Rev. 6) to the Department of Labor. The conformance request included classifications for technicians. The Navy recommended approval of the conformance request notwithstanding that the two newly applicable wage determinations did not include technician classifications. On October 1, 1986, the contracting officer issued Modification No. P00020 (Mod. 20) which incorporated the two new wage determinations into Contract III. Mod. 20 was issued under the authority of DAR 7–1905(b), the Fair Labor Standards Act and Service Contract Act— Price Adjustment Clause (Price Adjustment Clause) and became effective immediately, at the start of the first option year of Contract III.

Two and one-half months later, on December 15, 1986, the Administrator of the Wage and Hour Division of the Department of Labor rejected Burnside–Ott's base year conformance request. The Administrator determined that Burnside–Ott should never have classified any of its employees as technicians under WD 81–77 (Rev. 6), and ordered Burnside–Ott to reclassify its technician workers, in the base year of the contract, to higher-salaried aircraft workers. Burnside–Ott also was required to pay the reclassified aircraft workers the difference between what they had earned as technicians and what they should have earned in the base year of the contract, retroactive to the commencement date of Contract III. The Administrator's decision was affirmed twice: once upon reconsideration by the Administrator on December 4, 1987 and, on appeal, by the Deputy Secretary of Labor on January 10, 1989.

Pursuant to the new wage determinations Burnside–Ott increased employee wages for the first option year of Contract III. Burnside–Ott also paid all back wages to its misclassified employees as directed by the December 15, 1986 Order of the Department of Labor. On August 23, 1989, Burnside–Ott submitted a claim to the contracting officer for reimbursement of costs incurred in complying with the Department of Labor's December 15, 1986 retroactive reclassification order and the alleged reclassification of technicians to aircraft workers in the first option year, pursuant to the two new wage determinations. The claim was denied by the contracting officer on November 9, 1989. Burnside–Ott filed this suit on October 25, 1990, seeking damages in the amount of $3,166,691.61.

## DISCUSSION

 In considering this motion to dismiss for lack of subject matter jurisdiction pursuant to RUSCC 12(b)(1), the court must accept as true any undisputed allegations of fact made by Burnside–Ott. *Reynolds v. Army and Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988). *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). When disputed facts relevant to the issue of jurisdiction exist, the court is required to decide those facts. *Reynolds*, 846 F.2d at 747; *Hedman v. United States*, 15 Cl.Ct. 304, 306 (1988). Burnside–Ott has the burden of establishing jurisdiction. *Metzger, Shadyac & Schwartz v. United States*, 10 Cl.Ct. 107, 109 (1986).

Summary judgment is appropriate when "there is no genuine issue as to any material fact" so that the moving party "is entitled to judgment as a matter of law." RUSCC 56(c) (1991). In evaluating a motion for summary judgment, evidentiary matters outside the pleadings may be considered, *Indium Corp. of Am. v. Semi-Alloys, Inc.*, 781 F.2d 879, 884 (Fed.Cir. 1985), *cert. denied*, 479 U.S. 820, 107 S.Ct. 84, 93 L.Ed.2d 37 (1986), and any doubt as to whether a genuine issue of material fact exists must be resolved in favor of the nonmoving party. *Adickes v. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970); *Campbell v. United States*, 2 Cl.Ct. 247, 249 (1983). A genuine issue of material fact is one that would change the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Chevron U.S.A., et al. v. United States*, 17 Cl.Ct. 537, 540 (1989),

*rev'd on other grounds,* 923 F.2d 830 (Fed. Cir.1991). In order to show that a material fact is genuinely at issue, the non-movant must do more than present "some" evidence on the disputed issue. *Liberty Lobby, Inc.,* 477 U.S. at 248–250, 106 S.Ct. at 2509–11. As the Supreme Court stated, "[T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a [court] to return a verdict for that party. If the evidence [of the non-movant] is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. at 2510–11 (citations omitted). *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) which held that "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Burnside–Ott must do more than merely raise some doubt as to the existence of a fact; it must furnish some credible evidence sufficient to require trial on the merits. *Avia Group Int'l, Inc. v. L.A. Gear California, Inc.,* 853 F.2d 1557, 1560 (Fed.Cir.1988). Alternatively, defendant need not "produce evidence showing the absence of a genuine issue of material fact," but may merely show the court an absence of credible evidence to support Burnside–Ott's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The court will, absent a persuasive reason to the contrary, deem as established those material facts that defendant claims and adequately supports, unless such material facts are included in plaintiff's Statement of Genuine Issues, RUSCC 56(d)(2), and are controverted by affidavit, or other written or oral evidence. RUSCC 56(d)(3), Appendix H.

Burnside–Ott argued that the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1988), and the general Changes and Disputes Clauses in the contract, vest the Claims Court with jurisdiction to resolve any and all disputes that arise under or relate to the contract including disputes related to contract rights and obligations even though matters reserved to and decided exclusively by the Department of Labor were part of the factual predicate.

Defendant countered that the general Disputes Clause is abrogated by the "Disputes Concerning Labor Standards Clause," DAR § 7–1903.41(u), which gives the Department of Labor exclusive jurisdiction over matters "arising out of" the labor standards provisions of the contract. That clause states:

> [d]isputes arising out of the labor standards provisions of this contract shall not be subject to the general disputes clause of this contract. Such disputes shall be resolved in accordance with the procedures of the Department of Labor set forth in 29 CFR Parts 4.6, and 8. Disputes within the meaning of this clause include disputes between the contractor (or any of its subcontractors) and the contracting agency, the U.S. Department of Labor or the employees or their representatives.

*Id.* Defendant is correct that Section 7–1903.41(u) requires that disputes arising out of the labor standards provisions of the contract are not subject to the general Disputes Clause, but are to be resolved by the Department of Labor. Similarly, disputes arising out of the labor standards provisions of a contract "are not ... subject to the Contract Disputes Act...." *Emerald Maintenance, Inc. v. United States,* 88–3 B.C.A. (CCH) ¶ 21,103, at 106,532, 1988 WL 97169, *aff'd,* 925 F.2d 1425 (Fed.Cir.1991). The court agrees with Burnside–Ott that this court has jurisdiction when "a dispute centers on the parties' mutual contract rights and obligations, ... even though matters reserved to and decided exclusively by the Department of Labor are part of the factual predicate." *Emerald Maintenance,* 88–3 B.C.A. (CCH) ¶ 21,103, at 106,-532. However, the court cannot agree that it has subject matter jurisdiction when issues within exclusive Department of Labor jurisdiction form the entire factual predicate. Thus, to determine whether it has subject matter jurisdiction to entertain this suit, the court must address Burnside–Ott's claims to determine whether they exclusively arise "out of the labor standards

provisions," or whether the labor dispute is only part of the factual predicate. *See Emerald Maintenance*, 925 F.2d at 1428.

In its complaint, Burnside–Ott sought a price adjustment for costs incurred both in its alleged forced reclassification of technicians to aircraft workers as a result of wage determinations WD 85–1143 (Rev. 1) and WD 85–1248 (Rev. 1) incorporated into the contract by Mod. 20, and in complying with the December 15, 1986 ruling of the Department of Labor, requiring back pay in the base year of the contract.

Burnside–Ott attempted to capitalize on the confusion that can be traced to the unfortunate timing of (1) issuance of the new wage determinations and Mod. 20, (2) the start of the first option year, and (3) the December 15, 1986 ruling of the Department of Labor. Wage determinations WD 85–1143 (Rev. 1) and WD 85–1248 (Rev. 1) were issued near to the close of the base contract year. Mod. 20 incorporated them into the contract effective the first day of the first option year. At that discrete moment in time Burnside–Ott thought it had properly classified certain of its employees as technicians in the base contract year. But, because the technician classification was not included in the new wage determinations, Burnside–Ott believed it was required, as a single act at the start of the first option year, to reclassify its technicians as aircraft workers and increase all aircraft worker wages pursuant to the new wage determinations. The court is not aware of how Burnside–Ott addressed the classification issue of its technicians at the start of the first option year under the new wage determinations, but this lack of specific knowledge has no bearing on the outcome of the case. If Burnside–Ott reclassified its technicians to aircraft workers at the start of the first option year it was nothing more than a "paper reclassification" insufficient to support a price adjustment even though at that point in time Burnside–Ott could fairly have assumed that it was entitled to a double price adjustment: one for a wage increase allegedly caused by being forced to reclassify its technicians to higher paid aircraft workers at the start of the first option year because the new wage determinations did not contain a classification for technician's, and the other for the general wage increase for all aircraft workers contained in the new wage determinations. But, as Burnside–Ott learned a few months later, on December 15, 1986, its base year technicians should have been classified, and paid, as aircraft workers.

Likewise, neither the new wage determinations nor Mod. 20 in any manner caused the base year reclassification to correct Burnside–Ott's misclassification of its certain of its employees as technicians. That action can be traced directly, and only, to the Department of Labor's December 15, 1991 adjudication of the labor dispute that arose out of wage determination WD 88–71 (Rev. 6).

With the luxury of hindsight Burnside–Ott, and the court, now know that the technicians should have been classified, and paid, as aircraft workers throughout the entire contract period, including the base year. That being the case, no reclassification occurred in fact at the start of the first option year; the technicians were, as a matter of fact and law, aircraft workers. Accordingly, the only price adjustment to which Burnside–Ott ever became entitled was for the wage increases for its aircraft worker employees mandated by the new wage determinations, as was its experience in Contract I. The claims will be discussed in more detail below.

The Service Contract Act Price Adjustment Clause Claim.

■ In Count I of its complaint, Burnside–Ott sought reimbursement under the Price Adjustment Clause of the labor standards provisions which states that a contractor is entitled to a price adjustment for all increased wage costs resulting from an increased wage determination. Burnside–Ott stated that it carefully and intentionally did not contest the validity of the Department of Labor's actions in issuing WD 85–1143 (Rev. 1) and WD 85–1248 (Rev. 1), the Department of Labor's December 15, 1986 rejection of Burnside–Ott's conformance request, or any other action taken by

the Department of Labor. Burnside–Ott is correct that under the base year of Contract III it had the option of classifying certain employees as technicians and, as a direct result of the two new wage determinations incorporated into the contract by Mod. 20, it lost that option. That loss is of no moment, however, because Burnside–Ott never employed technicians, at least properly. Tortuously, based on unsupported conclusions, and with a dearth of logic, Burnside–Ott argued that because the contracting agency, under the authority of the Price Adjustment Clause, issued Mod. 20, Burnside–Ott was entitled to be reimbursed, by the contracting agency, for the costs of reclassifying its technicians to aircraft workers at the start of the first option year, and the retroactive wage costs it bore to conform its work force to the proper classifications in the base year of the contract. These acts, Burnside–Ott alleged, fell within the purview of the Price Adjustment Clause, and because its costs were increased by a wage determination applied to the contract by operation of law, it was entitled to reimbursement for the retroactive payments made for the base year of the contract and its subsequent increased costs under the option years. The Price Adjustment Clause is as follows:

FAIR LABOR STANDARDS ACT AND SERVICE CONTRACT ACT—PRICE ADJUSTMENT (MULTI YEAR AND OPTION CONTRACTS) (SEP 1979)

(a) The Contractor warrants that the prices set forth in this contract do not include any allowance for any contingency to cover increased costs for which adjustment is provided under this clause.

(b) The minimum prevailing wage determination, including fringe benefits, issued pursuant to the Service Contract Act of 1965, as amended (41 U.S.C. 351 et seq.), by the Administrator, Wage and Hour Division, U.S. Department of Labor, current at the beginning of each renewal option period, shall apply to any renewal of this contract. When no such determination has been made as applied to this contract, then the Federal minimum wage, as established by section 6(a)(1) of the Fair Labor Standards Act of 1938, as amended (29 U.S.C. 201 et seq.), current at the beginning of each renewal option period, shall apply to any renewal of this contract.

(c) When, as a result of (i) the Department of Labor determination of minimum prevailing wages and fringe benefits applicable at the beginning of the renewal option period, or (ii) an increased or decreased wage determination otherwise applied to the contract by operation of law, or (iii) an amendment to the Fair Labor Standards Act enacted subsequent to award of this contract, affecting the minimum wage, which becomes applicable to this contract under law, the Contractor increases or decreases wages or fringe benefits of employees working on this contract to comply therewith, the contract price or contract unit price labor rates will be adjusted to reflect such increases or decreases. Any such adjustment will be limited to increases or decreases in wages or fringe benefits as described above, and the concomitant increases or decreases in social security and unemployment taxes and workmen's compensation insurance, but shall not otherwise include any amount for general and administrative costs, overhead, or profits.

(d) The Contractor shall notify the Contracting Officer of any increases claimed under this clause within thirty (30) days after the effective date of the wage change, unless this period is extended by the Contracting Officer in writing. In the case of any decrease under this clause, the Contractor shall promptly notify the Contracting Officer of such decrease but nothing herein shall preclude the Government from asserting a claim within the period permitted by law. The notice shall contain a statement of the amount claimed and any other relevant data in support thereof, which may reasonably be required by the Contracting Officer. Upon agreement of the parties, the contract price or contract unit price labor rates shall be modified in writing. Pending agreement on or determination of, any such adjustment and its

effective date, the Contractor shall continue performance.

(e) The Contracting Officer or his authorized representative shall, until the expiration of three (3) years after final payment under the contract, have access to and the right to examine any directly pertinent books, documents, papers and records of the Contractor.

Burnside–Ott concluded that, "[s]imply stated, the Government relied upon the Price Adjustment Clause to modify the Contract, but refuses to [fully] pay plaintiff in accordance with that clause." To prevail, Burnside–Ott claimed it need only show that its prospective and retroactive wage costs were increased by a the issuance of Mod. 20.

The Price Adjustment Clause is a part of the labor standards provisions of the contract and establishes three different circumstances, one of which must occur before the contractor becomes eligible for a price adjustment. DAR § 7–1905(c). Under the first condition, a contractor may be entitled to a price adjustment if its employees' wages are raised as a result of a Department of Labor increase of minimum wages at the beginning of an option period. Secondly, a contractor is entitled to a price adjustment if its employees' wages are raised as the result of an increased wage determination applied to the contract by operation of law. Finally, a contractor may receive a price adjustment if the Fair Labor Standards Act minimum wage is raised and the raise increases the contractor's wage costs.[4]

Unquestionably, Burnside–Ott became entitled to, and received, a price adjustment for the increased wage rates required by the new wage determinations. But, try as it might, Burnside–Ott is not entitled to more than it has already received under the Price Adjustment Clause. Mod. 20 did not require Burnside–Ott to reclassify and retroactively pay its misclassified technician employees a higher salary during the base year contracts. Nor did Mod. 20 require Burnside–Ott to reclassify its technicians to aircraft workers. It simply in-

creased the wages of its employees in the base year, who in fact were aircraft workers. The fact that the Navy implemented the Department of Labor's two new wage determinations in Mod. 20 is irrelevant to Burnside–Ott's claims. The December 15, 1986 reclassification order directed solely at the base contract year was a completely independent act by the Department of Labor, but most importantly, was not a wage determination within the meaning of the Price Adjustment Clause.

This case is factually similar to *Emerald Maintenance*, notwithstanding Burnside–Ott's protestations that it was not. Even though the contractor in *Emerald Maintenance* did not seek to recover under the same Price Adjustment Clause, it did seek recovery under a clause containing language identical to the Price Adjustment Clause at issue here. In *Emerald Maintenance*, a construction contractor, relying on the terms of a wage determination, classified many of its workers as laborers. After contract award, the Department of Labor ruled that the employees classified as laborers should have been classified as roofers, a higher-paid classification. Emerald Maintenance, Inc. was required, under the labor standards provisions of the contract, to reclassify the workers as roofers. Emerald Maintenance, Inc.'s claim to recover increased wage costs was denied, and it filed an appeal with the Armed Services Board of Contract Appeals. The Board held it lacked jurisdiction over the claim because, in contesting the adequacy of job descriptions, Emerald Maintenance, Inc. had actually attacked the contents of the wage determination. *Emerald Maintenance*, 88–3 B.C.A. (CCH) ¶ 21,103, at 106,-532. The Federal Circuit upheld the Board's dismissal of those claims because they arose out of the labor standards provisions of the contract holding that "[h]owever Emerald [chose] to style its complaint, ... the listing of job categories and wage rates in the contracts is surely one of the labor standards provisions." *Emerald Maintenance*, 925 F.2d at 1429.

---

4. The third circumstance is not applicable to the facts of this case and will not be considered.

Even though Burnside–Ott sought to camouflage its labor claims under the Price Adjustment Clause by contesting the actions of the contracting agency, it actually sought to recover for the increased wages it had to pay certain of its employees pursuant to the December 15, 1986 Department of Labor ruling. The language in the Department of Labor's December 15, 1986 ruling, rejecting Burnside–Ott's conformance request, makes clear beyond argument that the ruling was based on WD 81–77 (Rev. 6), and not the two later wage determinations incorporated into the contract by Mod. 20. The Department of Labor stated that, "[c]onforming actions for these classifications are not necessary since they are adequately covered by the aircraft worker and supply clerk/material clerk classifications contained in WD 81–77 (Rev. 6), and as such are not conformable." The Department of Labor also listed the applicable wage rates, and quoted the "aircraft worker" classification at $11.04 an hour. Under WD 81–77 (Rev. 6), "aircraft workers" were paid $11.04 an hour; this wage was increased to $11.49 an hour in the later wage determinations. The December 15, 1986 ruling of the Department of Labor did not become a modification to the contract; rather, it was an adjudication under the labor standards provisions of the contract of the proper classification to be given certain employees of Burnside–Ott during the base year of the contract. Naturally, those same employees were covered by the later wage determinations beginning with the first option year of the contract. Here, as in *Emerald*, the matters reserved to and decided exclusively by the Department of Labor were not merely a part of the factual predicate, but rather formed the entire basis for Count I in Burnside–Ott's complaint. However Burnside–Ott chose to style its complaint, the listing of job categories and wage rates in Contract III was surely one of the labor standards provisions. *See Emerald*, 925 F.2d at 1429. Moreover, Burnside–Ott explicitly acknowledged that its claim was a labor dispute by turning initially to the Department of Labor for resolution of the dispute. As specified in the Service Contract Act—

Price Adjustment Clause, wage classification and rate disputes between the contractor and its employees must be submitted to the Department of Labor for final resolution. 29 C.F.R. § 4.6 (1990).

Although Burnside–Ott attempted to craft its complaint so that the complaint did not appear to challenge the Department of Labor's actions, the court cannot ignore the fact that Burnside–Ott brought this suit to recover the increased costs it incurred as a result of the Department of Labor's December 15, 1986 ruling. As such, plaintiff's claim under the Price Adjustment Clause arose exclusively out of the labor standards provisions of the contract and the court lacks subject matter jurisdiction. The Changes Clause Claim.

Count II of Burnside–Ott's complaint sought to recover under the general Changes Clause of the contract, which provided for an equitable adjustment to compensate for a change in the services to be performed, and the time and place of performance. To recover under this clause, the change must be within the general scope of the contract and the Changes Clause. *See* R. Nash & J. Cibinic, *Administration of Government Contracts* 306 (2d ed. 1985).

As in Count I, Burnside–Ott argued that this court has jurisdiction over Count II by focusing its claim wholly on the contracting agency's issuance of Mod. 20, rather than on the Department of Labor's December 15, 1986 rejection of Burnside–Ott's conformance request under WD 81–77 (Rev. 6), or the two new wage determinations. Burnside–Ott argued that the Navy, by issuing Mod. 20, altered the employee classifications initially available to it by deleting technicians from the applicable wage determinations, thereby constituting a unilateral and discretionary action that effected a general change to the contract by substantially increasing Burnside–Ott's costs of performance in the option years of the contract. That argument is not correct. Mod. 20 simply increased the wages of aircraft workers, and others, for which Burnside–Ott has been reimbursed. As we now know Mod. 20 did not require a reclas-

sification, much less a reclassification that would entitle Burnside–Ott to an equitable adjustment under the general Changes Clause of the contract. Aside from increased labor costs, Burnside–Ott alleged only one change brought about by Mod. 20, *i.e.,* "the burden of performing the [c]ontract with a radically altered work force structure." However, Burnside–Ott did not argue or present evidence to show that it altered or changed its work force. Had Burnside–Ott properly classified its employees in the first instance it would never have employed technicians. Burnside–Ott's mistake was in employing technicians to do work properly performed by aircraft workers. Burnside–Ott certainly did not allege that it terminated its misclassified technicians and replaced them with higher-skilled aircraft workers; neither did it allege that it changed the duties of any of its employees. To the contrary, Burnside–Ott simply changed the classifications and wage rates of certain employees to comport with their actual duties, as determined by the Department of Labor on December 15, 1986. Mod. 20 did not change the base year contract to entitle Burnside–Ott to an equitable adjustment under the general Changes Clause for the retroactive increased wages caused by its initial misclassification of some of its employees. Nor did Mod. 20 require reclassification of the employees Burnside–Ott had misclassified. Thus, Mod. 20 did not "alter the workforce" in any manner, much less "radically."

While Count II was presented as a contract change claim under the general Changes Clause of the contract, in reality it was nothing more than another attack upon the labor standards provisions as in Count I. *Emerald* at 1428. As such, this court lacks subject matter jurisdiction.

The Changes Clause/Breach of Contract Claim.

In Count III, Burnside–Ott repeated its charge that in issuing Mod. 20 the Navy changed the contract so as to fundamentally alter the undertakings of the parties and their reasonable expectations at the time of contract award. Burnside–Ott claimed that the change constituted a breach of contract for which it is entitled to recover damages as a matter of law. However, Burnside–Ott never stated how its claims under the Changes Clause constituted a breach of contract.

Burnside–Ott's claim is indeed murky. Its claim in Count III is similar to that in Count II. It argued that the decisions of this court provide for the recovery of increased costs "if they result from additional work, beyond the minimal standards required by the contract, and that work is ordered by the words or deeds of government agents," *see IBI Sec. Serv., Inc. v. United States,* 19 Cl.Ct. 106, 111 (1989), *aff'd,* 918 F.2d 188 (Fed.Cir.1990), and that this right of recovery has been expanded "to permit recovery of increased costs incurred pursuant to increased wage requirements." Burnside–Ott's purported key to recovery here, as in Counts I and II, was the Navy's issuance of Mod. 20. Burnside–Ott's bald argument that the Navy breached the contract by issuing Mod. 20 must fail. Clearly, as the court has already found, Mod. 20 did nothing more than incorporate the new wage determinations into the contract, for which Burnside–Ott received a price adjustment as compensation under the Price Adjustment Clause of the labor standards provisions for its increased labor costs. Mod. 20 did not require Burnside–Ott to reclassify its technician workers in the base year or for the first option year, or give them back pay for the base year of Contract III.

■■■ The claim language suggests a cardinal change argument. "An allegation of a cardinal change is a suggestion that the contract has been breached; that the work is a drastic modification beyond the original agreement." *Servidone Constr. Corp. v. United States,* 20 Cl.Ct. 725, 727 (1990). This court has consistently ruled that the Changes Clause of the contract will not authorize "a drastic modification beyond the scope of the contract." *Air–A–Plane Corp. v. United States,* 408 F.2d 1030, 1033, 187 Ct.Cl. 269 (1969). The test for a finding of a cardinal change would be whether Burnside–Ott's undertaking was

modified far beyond the work for which the parties bargained when the base year contract was awarded. *Air–A–Plane,* 408 F.2d at 1033. An example of a cardinal change is found in *General Contracting & Constr. Co. v. United States,* 84 Ct.Cl. 570 (1937), where the court held that the elimination of an entire building from a construction contract was a cardinal change. Burnside–Ott would have this court find that Mod. 20 so changed the nature of its undertaking in the base year and first option year of the contract as to constitute a cardinal change, and hence a breach of contract. While there was a cost to Burnside–Ott of the retroactive reclassification under WD 81–77 (Rev. 6) it was nothing more than a *nunc pro tunc* correction pursuant to the labor standard provisions of the contract with absolutely no change to Burnside–Ott's performance responsibilities. Likewise, as Mod. 20 did not require reclassification at the start of the first option year such as would entitle it to a price adjustment, and Burnside–Ott did receive a price adjustment for the wage increases in the new wage determinations, there was no uncompensated change in its performance requirements. Mod. 20 did not constitute a breach of contract. Inasmuch as the reclassification arose out of the labor standards provisions of the contract this court does not have subject matter jurisdiction. *Emerald* at 1428.

The Equitable Estoppel Claim.

The issues comprising Burnside–Ott's equitable estoppel claim in Count IV do not arise out of the labor standards provisions of the contract because they do not require the court to revisit actions taken by the Department of Labor. The court will decide Count IV under defendant's 12(b)(4) motion, converted by operation of the rules of this court to a motion for summary judgment.

Burnside–Ott claimed that the Navy's conduct, verbal representations of support, acquiescence over the course of three separate contracts, and its recommended approval of Burnside–Ott's conformance request to the Department of Labor all indicated that the Navy encouraged Burnside–Ott to classify certain of its employees as technicians under WD 81–77 (Rev. 6). Burnside–Ott cited *Essen Mall Properties v. United States,* 21 Cl.Ct. 430, 446 (1990), for the five elements it must prove to perfect its claim of equitable estoppel.[5] Burnside–Ott argued that its reliance on the Navy's conduct and representations caused it to incur substantially increased costs of performance, and that the Navy's failure to reimburse Burnside–Ott for such costs was a breach of contract, liability for which the Navy should be equitably estopped to deny. Burnside–Ott concluded that dismissal of its equitable estoppel claim would be inappropriate because facts that might support its claim are known only to the Navy, but not at this time to Burnside–Ott, notwithstanding that Burnside–Ott was given ample opportunity to conduct discovery to adequately refute defendant's motions. RUSCC 56(g).

Equitable estoppel is used to bar a party from raising a defense or objection it otherwise could have, or from instituting an action a party is entitled to pursue, *Pacific Gas,* 3 Cl.Ct. at 340, and has been analogized to a shield. *Biagioli v. United States,* 2 Cl.Ct. 304, 307 (1983) (quoting *Jablon v. United States,* 657 F.2d 1064, 1068 (9th Cir.1981)). Consequently, a litigant seeking the benefit of equitable estoppel must have a valid claim that would otherwise entitle it to prevail against a defendant. *ATC Petroleum, Inc. v. Sanders,* 860 F.2d 1104, 1111 (D.C.Cir.1988).

**5.** *Essen* held that "(1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe that it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury. *Pacific Gas* [*& Elec. Co. v. United States,* 3 Cl.Ct. 329, 340 (1988), *aff'd,* 738 F.2d 452 (Fed.Cir.1984)].

A fifth element of equitable estoppel was identified in *City of Alexandria* [*v. United States,* 3 Cl.Ct. 667, 679 (1983), *rev'd on other grounds,* 737 F.2d 1022 (Fed.Cir.1984)]: '[i]n order to estop the Government, the conduct or representatives relied upon must be made by government officers acting within the scope of their authority.'" *Essen,* 21 Cl.Ct. at 446.

Because the court has found that Burnside–Ott failed to state a breach of contract claim or any right to recovery under the Price Adjustment Clause and the general Changes Clause, the court has no basis upon which to exercise jurisdiction over Burnside–Ott's estoppel claim.

More importantly, the Supreme Court has, for all practical purposes, all but slammed closed the door on equitable estoppel claims against the government. *See Office of Personnel Management v. Richmond*, 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990). In *Richmond*, a government employee provided erroneous written and oral advice to a claimant about an entitlement to benefits. As a result of the erroneous advice, claimant lost the value of six months of benefits. The Court of Appeals for the Federal Circuit held that the erroneous advice constituted "affirmative misconduct," and therefore, the government should be estopped from denying benefits to the claimant. In reversing, the Supreme Court noted that, "[f]rom our earliest cases, we have recognized that equitable estoppel will not lie against the Government as against private litigants." *Richmond*, 110 S.Ct. at 2469. The Supreme Court observed that, although more recent decisions have mentioned the possibility that some type of "affirmative misconduct" might give rise to estoppel against the government, it has reversed every finding of estoppel that it has reviewed. *Id.* at 2470. Notwithstanding Burnside–Ott's argument that the Supreme Court did not place a blanket prohibition upon estoppel against the federal government, the Court made clear that the doctrine of equitable estoppel is not applicable to monetary claims against the government.

> Whether there are any extreme circumstances that might support estoppel in a case not involving payment from the Treasury is a matter we need not address. As for monetary claims, it is enough to say that this Court has never upheld an assertion of estoppel against the Government by a claimant seeking public funds.

*Id.* at 2476.

The holding of the Supreme Court in *Richmond* is based on the rationale that "courts cannot estop the Constitution" because the Appropriations Clause of the Constitution provides that: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by law...." U.S. Const. art. I, § 9, cl. 7. The doctrine that "the Government may not be estopped on the same terms as any other litigant" is grounded upon both strong policy considerations and constitutional principles. *Heckler v. Community Health Serv.*, 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984). It protects the public fisc from the consequences of erroneous conduct by government employees, and ensures that the Executive Branch faithfully carries out legislative mandates by preventing actions of agency representatives from overriding the will of Congress. As the Supreme Court explained:

> Even short of collusion by individual officers or improper Executive attempts to frustrate legislative policy, acceptance of estoppel claims for Government funds could have pernicious effects. It ignores reality to expect that the Government will be able to "secure perfect performance from its hundreds of thousands of employees scattered through the continent." *Hansen v. Harris*, 619 F.2d 942, 954 (CA2 1980) (Friendly, J., dissenting), rev'd [sic] *sub nom., Schweiker v. Hansen*, 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981). To open the door to estoppel claims would only invite endless litigation over both real and imagined claims of misinformation by disgruntled citizens, imposing an unpredictable drain on the public fisc. Even if most claims were rejected in the end, the burden of defending such estoppel claims would itself be substantial.

*Richmond*, 110 S.Ct. at 2476.

Burnside–Ott cited *Broad Ave. Laundry & Tailoring v. United States*, 681 F.2d 746, 231 Ct.Cl. 1 (1982), as "sound legal precedent" to support its ability to main-

tain an equitable estoppel claim. The court disagrees. Estoppel of the government in *Broad Ave.* was allowed because the contracting officer, having exercised her authority, created a reasonable basis for the contractor's reliance. In *Broad Ave.* the contracting officer agreed that if the Department of Labor issued a wage determination, based on a new collective bargaining agreement, the contracting officer would include the new wage determination in the contract and the contractor would be entitled to a price adjustment by operation of law. The contracting officer did modify the contract to incorporate the new prevailing wage rates, and the contractor requested a price adjustment. The successor contracting officer refused to allow the price adjustment on the basis that a local prevailing wage determination, not based on a new statute or regulation, did not force any change in wage rates under a contract already in effect. " 'Such wage determinations are effective for contracts not yet awarded....' " *Id.*, 231 Ct.Cl. at 3. The court held that, although the original contracting officer erroneously applied the applicable regulations by allowing a wage rate change in an ongoing contract based on a local prevailing wage determination rather than on a new statute or regulation, the action was within the scope of her authority and thus acted as an estoppel upon the government. *Id.*, 231 Ct.Cl. at 5–7. In the case at hand, Burnside–Ott's estoppel claim is based on its contention that Navy contracting officials encouraged Burnside–Ott to classify some of its employees as technicians under WD 81–77 (Rev. 6). Contrary to the facts in *Broad Ave.*, the duty of ensuring that a contractor's employees are classified properly is not within the scope of a contracting officer's authority; in fact, the contracting agency plays only a limited, and certainly nonbinding, role in that decision. *See* DAR 7–1903.41. The initial responsibility for employee classifications is on the contractor, and only the Department of Labor has the final and exclusive authority to determine whether the contractor's classification was proper. *Collins Int'l Serv. Co. v. United States,* 744 F.2d 812, 815 (Fed.Cir.

1984). Any recommendation or indication of approval by the Navy as to how Burnside–Ott should have classified its employees was simply that, its recommendation. Actions or statements of Navy contracting officials in this context cannot provide a reasonable basis for reliance by the contractor. The court further notes that *Broad Ave.* was decided before the Supreme Court addressed *Richmond.* The court doubts seriously that a *Broad Ave.* argument still is viable.

In one final note, it appears that Burnside–Ott did not read all of *Essen* when it took the quote from that opinion purporting to support its equitable estoppel claim. Had Burnside–Ott read but four more paragraphs, it would have discovered that, even there, equitable estoppel was found not to lie against the government for a money claim. Judge Lydon in *Essen* concluded that:

> the Supreme Court has recently held, in the context of government employee misconduct, that the doctrine of equitable estoppel will not lie against the government. The Supreme Court observed that it has never upheld an estoppel claim against the government for the payment of money. Since this court's jurisdiction is limited by the Tucker Act, 28 U.S.C. § 1491, to payment of money damages against the government, plaintiff's equitable estoppel argument cannot be sustained.

*Essen,* 21 Cl.Ct. at 446 (citations omitted). Although Burnside–Ott obviously disagrees with *Richmond,* it is the law of this court.

In view of the foregoing, this court more than likely lacks subject matter jurisdiction to entertain a claim for equitable estoppel against the United States for a money claim, and certainly, as a matter of law, cannot grant relief upon such a claim. Even if Burnside–Ott were able to discover evidence of the intentions of the contracting officials vis-à-vis the five elements outlined in *Essen,* Burnside–Ott could not, in these circumstances, create credible, colorable, or probative evidence raising genuine issues of material fact which would alter the outcome of its claim of equitable estop-

pel. Plaintiff has not, and cannot in these circumstances, present genuine issues of material fact which justify trial. Defendant's 12(b)(4) motion to dismiss Count IV, considered a motion for summary judgment, is allowed.

The Mutual Mistake Claim.

Pursuant to the Contract Disputes Act, the court also has subject matter jurisdiction over issues that center on the mutual contract rights and obligations of the contracting parties. *See Emerald Maintenance,* 88–3 B.C.A. (CCH) ¶ 21,103, at 106,-532. Because the issues dealing with mutual mistake require this court to review only the actions of the Navy and Burnside–Ott, the labor standards provisions do not act as a bar to subject matter jurisdiction even though matters within the exclusive jurisdiction of the Department of Labor are part of the factual predicate.

In Count V Burnside–Ott sought contract reformation based on a theory of mutual mistake, and argued that the court must grant relief on the basis of mutual mistake "[w]here a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances...." *National Rural Util. Coop. Fin. Corp. v. United States,* 14 Cl.Ct. 130, 141 (1988) (quoting Restatement (Second) of Contracts § 152 (1981)). Burnside–Ott averred that at the time of award of Contract III both the Navy and Burnside–Ott reasonably believed that the employee classifications contained in WD 81–77 (Rev. 6) were applicable and had a material impact on Burnside–Ott's anticipated performance thereunder.[6]

In reviewing the law of mutual mistake, the court again discovered that Burnside–Ott quoted only that portion of *National Rural* that would support its position, ignoring the balance of the ruling that would defeat its argument. The rule from *National Rural* fully stated is as follows:

where a mistake of both parties at the time a contract was made as to a basic

assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party *unless he bears the risk of mistake under the rule stated in* [Restatement (Second) of Contracts] *§ 154* [1981].

*National Rural,* 14 Cl.Ct. at 141 (emphasis added). Section 154 states that "[a] party bears the risk of a mistake when the risk is allocated to him by agreement of the parties...." Restatement (Second) Contracts § 154 (1981).

Contrary to Burnside–Ott's assertions, "[t]here are many contract misapprehensions, common to both parties, which fall short of requiring reformation." *Flippin Materials Co. v. United States,* 312 F.2d 408, 415, 160 Ct.Cl. 357 (1963). A mutual mistake as to a material fact "will not support relief if the contract puts the risk of such a mistake upon the party [seeking] reformation." *Id.,* 312 F.2d at 415. The court agrees with defendant that the contract placed the risk of a mistaken employee classification on Burnside–Ott. That the contract was subject to the Service Contract Act of 1965 and the implementing regulations of the Secretary of Labor cannot be reasonably disputed. 29 C.F.R. § 4.1 (1990). The Service Contract Act provides, in part, as follows:

(a) Every contract ... entered into by the United States ... the principal purpose of which is to furnish services in the United States through the use of service employees, shall contain the following:

(1) A provision specifying the minimum monetary wages to be paid the various classes of service employees in the performance of the contract or any subcontract thereunder, as determined by the Secretary [of Labor]....

41 U.S.C. § 351 (1988). The Service Contract Act places responsibility for any violation of the above provision on the "party responsible therefor," and in the case of a violation authorizes the federal contracting agency to withhold payments due the con-

---

6. While this was the case, plaintiff was forced to the obvious in order to make its argument. Contrary to plaintiff's statement, the employee

classifications in WD 81–77 (Rev. 6) were applicable to the base year of Contract III. It could be no other way.

tractor, and to directly pay the employees the amounts due them. 41 U.S.C. § 352(a) (1988). The Department of Labor determines employee classifications and corresponding wages based on the skill required and the duties performed. The Service Contract Act and Contract III required Burnside–Ott to place its employees into the proper classifications. DAR § 7–1903.-41. Burnside–Ott failed to meet this requirement when it improperly classified certain of its employees as technicians instead of aircraft workers, resulting in the underpayment of wages to the "technicians." Drawing upon the clear language of the law, the regulations, and the contract, the court finds that Burnside–Ott is responsible for properly classifying and paying its employees the appropriate wage, as determined by Department of Labor.

Burnside–Ott made three arguments, claiming in two that genuine issues of material fact exist which preclude summary judgment. Burnside–Ott first claimed that the Navy's intentions regarding the employment of technicians by it in the base year of Contract III created a genuine issue of material fact. To force trial, Burnside–Ott alleged that, at the time Contract III was executed, Navy personnel intended for, and agreed with, plaintiff's use of technicians, and shared a belief with plaintiff that employment of technicians was responsive to the solicitation and necessary to perform Contract III. Burnside–Ott infers from this pattern of conduct that the Navy would have agreed, at the minimum, to have shared the increased labor costs with Burnside–Ott. Although the stated opinions of several Navy contracting officials supported Burnside–Ott's argument that it properly classified certain employees as technicians, that is not an issue of material fact and would have no bearing on the crucial issue of which party bore the burden of mistake. Reliance on informal advice from contracting agency officials is not a defense against a contractor's responsibility to properly classify and pay employees under the Service Contract Act. *Metropolitan Rehabilitation Corp.*, W.A.B. Case No. 78–25 (August 2, 1979). The Service Contract Act placed a duty on Burn-

side–Ott to properly classify its employees in accordance with the appropriate Department of Labor wage determination, or to conform the classifications of employees not specifically covered in the wage determination to provide a "reasonable relationship" with the skills required in the wage determination classification. 29 C.F.R. § 4.6(b)(2)(i) (1990). Nowhere in the Service Contract Act, or court-made law, is the contracting agency required to ensure that the contractor's employees are properly classified. Therefore, any "moral support" given Burnside–Ott by the Navy in classifying certain of its employees as technicians, and the Navy's recommended approval of Burnside–Ott's classification request under WD 81–77 (Rev. 6) is irrelevant; only the Department of Labor has the authority to determine whether a contractor's employees are properly classified. *Collins Int'l Serv. Co. v. United States*, 744 F.2d 812, 815 (Fed.Cir.1984).

Burnside–Ott also argued that summary judgment was inapplicable in these circumstances because the state of mind of the parties was critical at the time Contract III was executed and in order to understand the intent of a contract this court has recognized that summary judgment is not appropriate if issues are present which involve an inquiry into the state of mind of either of the parties. In *Favell v. United States*, 16 Cl.Ct. 700 (1989), the court interpreted several personal contracts of professional hockey players who were Canadian nationals to determine their tax liability to the United States. Judge Horn of this court held that:

> Contract interpretation, generally, is a matter of law and thus is amenable to decision on summary judgment. In a contract dispute, however, summary judgment will not be granted, if issues which involve an inquiry into the state of mind of either of the parties at the time the contract is entered are at issue. An inquiry into the contracting parties' intentions, which is a contractual interpretation issue, may require factual findings and a trial by the court.

*Id.* at 716 (citations omitted). Judge Horn, however, concluded in the next paragraph that:

> The rule, however, is well settled that when the terms of a written contract are clear and unambiguous, the intent of the parties must be found therein. The preliminary question of whether, based on the words of the contract, a contract ambiguity exists which could result in a finding that the views of the parties when they entered into the contract could differ, is a question of law, which may be resolved by the court, in summary proceedings.

*Id.* at 716–17 (citations omitted). The state of mind of the parties to a contract could present an issue sufficient to bar summary disposition but only if the intention of the parties at execution are crucial to interpretation of the contract. "[I]t is a fundamental precept of common law that the intention of the parties to a contract control its interpretation." *Firestone Tire & Rubber Co. v. United States*, 444 F.2d 547, 551, 195 Ct.Cl. 21 (1971). But before a court explores the depths of a contract, it must find a need to do so. If a contract is not ambiguous, the wording controls its meaning "and resort cannot be had to extraneous circumstances or subjective interpretations to determine such meaning." *Perry and Wallis, Inc. v. United States*, 427 F.2d 722, 725, 192 Ct.Cl. 310 (1970). "This court, therefore, should not attempt to interpret the words of those contracts in order to seek a deeper meaning as expressions of the intent of the parties to the contract, because there is no contractual ambiguity which would require such an inquiry." *Favell*, 16 Cl.Ct. at 716. A contract is ambiguous only if it is susceptible of two different interpretations, each of which is found to be consistent with the contract's language. *Sun Shipbuilding & Dry Dock Co. v. United States*, 393 F.2d 807, 815–16, 183 Ct.Cl. 358 (1968). This court has not been presented with such an issue of contract interpretation; therefore, the alleged state of mind of the Navy contracting officials, at the time the base contract was executed, need not be explored. Burnside–Ott did not argue that the contract was ambiguous, only that it was lead to believe that it could classify some of its employees as technicians in the base year contract. That fact is certainly not in dispute. The court agrees that Burnside–Ott could have classified employees as technicians in the base contract, as does defendant. Burnside–Ott's mistake was in classifying employees with the skills and duties of aircraft workers as technicians. Had Burnside–Ott actually employed workers with the skills and duties of technicians, it could have properly classified those workers as technicians. No amount of inquiry into the Navy's state of mind, or the intentions of its contracting officials, could possibly create a genuine issue of material fact on this issue.

Burnside–Ott also argued that the issue of who assumed the risk of mutual mistake was a mixed issue of fact and law, and that the underlying facts were in dispute. Burnside–Ott claimed the Price Adjustment Clause in the contract raised disputed issues of fact in that the clause placed the risk of increased wage rates on the Navy, and "increased wage costs were to be addressed by an equitable [*sic*] adjustment." If any term of the contract, the Service Contract Act, the Contract Disputes Act, or the implementing regulations, puts the risk of increased wage costs on the Navy in these circumstances, plaintiff did not identify it, nor is the court aware of such a term.

Burnside–Ott gratuitously stated that because it did not include any cost contingencies for increased labor rates in its contract proposal, it was not prepared, and did not expect, to assume the costs of reclassification. This argument does not present an issue of material fact because the court has already found, in these circumstances, that no relief can be granted under the Price Adjustment Clause. The Price Adjustment Clause is applicable only to "an increased or decreased wage determination otherwise applied to the contract by operation of law," DAR § 7–1905(c), and no increased wage determination applied to the contract by operation of law under WD 81–77 (Rev. 6). The Department of Labor's December

15, 1986 ruling that Burnside–Ott had misclassified its employees under WD 81–77 (Rev. 6), and was required to classify them correctly, was an action separate from the contract. Nor did the new wage determinations, in the circumstance presented here, require reclassification. Burnside–Ott's argument that it had not included a contingency in its proposal for increased labor rates, and had not expected to bear the cost of the retroactive payments, cannot shift the responsibilities of the contracting parties. In fact, the labor standards provisions of the solicitation and Contract III required Burnside–Ott to certify that it had not included a contingency in its price for increased labor rates because defendant was required to reimburse Burnside–Ott for all increased wage costs ordered by the Department of Labor, as defendant did on several occasions. *See Emerald Maintenance, Inc. v. United States,* 88–3 B.C.A. (CCH) ¶ 21,103, at 106,532, 1988 WL 97169, *aff'd,* 925 F.2d 1425 (Fed. Cir.1991). The court does not assume that Burnside–Ott intentionally misclassified certain of its employees, but lack of intent cannot cure the mistake or entitle it to relief, at least by the courts.

Burnside–Ott's final argument was that even if the government established the initial risk of a mutual mistake to be Burnside–Ott's, this is a case in which the facts should shift that risk because Burnside–Ott did not "buy into" the contract by intentionally misclassifying its employees. Burnside–Ott claimed it relied upon the Navy's conduct in two preceding contracts and the express language of a Navy solicitation and contract, including WD 81–77 (Rev. 6), that listed technicians as available classifications of employees. Burnside–Ott argued that the Navy's "pattern of conduct" presented genuine issues of material fact germane to the issue of shifting risk that would preclude summary judgment. Burnside–Ott's argument again lacks merit. For the reasons already stated, any position or action taken by the Navy had no bearing on the proper classification of its employees by Burnside–Ott. Burnside–Ott cannot shift that burden or create a genuine issue of material fact simply by highlighting the Navy's prior actions, including its inexplicable recommended approval of Burnside–Ott's conformance request. The affected employees were properly classified technicians in Contracts I and II, not because the Navy made that decision, but because the contractors did and the decision was not challenged by the Department of Labor. It should not be forgotten that the Navy suggested to the Department of Labor, during the planning phase of Contract III, that the technician classification be deleted from the wage determinations but the recommendation was ignored. This is ample proof that the Navy could not unilaterally delete that classification any more than it could deny Burnside–Ott the right to classify employees as technicians in the base year contract. The classifications included in WD 81–77 (Rev. 6) gave Burnside–Ott that option, but only if its employees' skills and duties properly fit within the technician classifications. The burden of proper employee classification cannot be shifted from the contractor to the contracting agency anymore than could the contracting agency usurp the final decision-making authority of the Department of Labor to assure proper classification. The actions of the Navy, and the opinions of several Navy contracting officials as to what Burnside–Ott could, or should, have classified its employees cannot, in these circumstances, create a genuine issue of material fact. Evidence of those opinions would not be credible, colorable, or probative to the adjudication of Burnside–Ott's claim. Defendant's 12(b)(4) motion to dismiss Count V, considered a motion for summary judgment, is allowed.

## CONCLUSION

For the reasons stated, the court allows defendant's motion to dismiss Counts I, II, and III of the complaint for lack of subject matter jurisdiction, pursuant to RUSCC 12(b)(1). The court found no genuine issues of material fact relevant to jurisdiction or to the merits of the case in Count IV that would require trial. Defendant cannot be equitably estopped to deny its refusal to reimburse Burnside–Ott for the

costs incurred in complying with the December 15, 1984 Order of the Department of Labor. Moreover, as a matter of law, Burnside–Ott failed to state a claim in Count IV upon which relief can be granted, RUSCC 12(b)(4), since the doctrine of equitable estoppel cannot be applied to monetary claims against the government. *See Office of Personnel Management v. Richmond*, 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990). The court did not find the existence of a mutual mistake of fact or law that would justify relief, but even if such a mistake existed, Burnside–Ott would not be entitled to relief because it accepted the risk of mistake under the labor standards provisions of the contract. Defendant's motion for summary judgment on Counts IV and V of the complaint is granted.

In sum, Burnside–Ott argued that this was not an employee misclassification issue governed by the December 15, 1986 ruling of the Department of Labor. The court concludes that it was exactly that. All five Counts in Burnside–Ott's complaint were predicated upon the argument that it was entitled to a price adjustment by reason of the issuance of Mod. 20 by the Navy, notwithstanding that the modification affected only the minimum wages in the first option year of Contract III, did not require a reclassification that would entitle Burnside–Ott to a price adjustment, and had absolutely nothing to do with the December 15, 1986 ordered base year reclassification.

Inasmuch as the court has ruled in defendant's favor on all Counts, the Clerk of the Court is directed to dismiss the complaint and enter judgment upon this Amended Order. Costs to defendant.

IT IS SO ORDERED.