**PANTEX PRESSING MACH., Inc., v. UNITED STATES.**

No. 46228.

Court of Claims.

June 2, 1947.

Richard S. Doyle, of Washington, D.C. (Hinckley, Allen, Tillinghast & Wheeler of Providence, R. I., on the brief), for plaintiff.

Kendall M. Barnes, of New York City, and John F. Sonnett, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and WHITAKER, MADDEN, JONES and LITTLETON, Judges.

WHITAKER, Judge.

These two cases were consolidated for trial.

The Pantex Manufacturing Corporation is the successor of the Pantex Pressing Machine, Inc. On November 30, 1944 the Pantex Pressing Machine, Inc., transferred all of its assets to Pantex Manufacturing Corporation in exchange for all the shares of the capital stock of the manufacturing corporation and the assumption by it of all the liabilities of Pantex Pressing Machine, Inc. Among the assets transferred was the claim upon which these suits were brought. We are of opinion that the assignment of the claim under these circumstances did not violate Revised Statutes § 3477, 31 U.S.C.A. § 203, and that Pantex Manufacturing Corporation is entitled to sue on the claim notwithstanding

this section, since this assignment was one by operation of law. Seaboard Air Line Railway v. United States, 256 U.S. 655, 41 S.Ct. 611, 65 L.Ed. 1149.

Pantex Pressing Machine, Inc., therefore, having divested itself of all right to the claim upon which suit is brought, is not entitled to recover, and its petition will be dismissed.

Unless otherwise indicated, both the Pantex Pressing Machine, Inc., and Pantex Manfacturing Corporation will be referred to hereafter as plaintiff.

The suit of Pantex Manufacturing Corporation is one for just compensation for the value of the property of Pantex Pressing Machine, Inc., which was requisitioned by the defendant, acting through the War Production Board, on September 25, 1942. The War Production Board determined that $5,127.57 was just compensation. The plaintiff refused to accept this amount, and there was, accordingly, paid to it one-half of said sum, or $2,563.78. Plaintiff claims that just compensation for its property is $75,702.56, and that it is entitled to recover the difference between this amount and the amount paid it, or $73,138.78, plus interest for delay in payment.

Pantex Pressing Machine, Inc., manufactured laundry and dry cleaning and pressing machinery. The heads of these machines were made of aluminum. The defendant requisitioned all but 80 of these heads. It requisitioned a total of 596 heads. Of these, 192 heads had been processed completely, 359 were about 95 percent complete, and 45 were raw castings upon which no processing had been done.

The requisitioned heads weighed 37,795 pounds. The defendant computed the amount to be paid at 13½ cents a pound, which was the so-called program price. Plaintiff claims it is entitled to recover its list price for the completed heads and the cost of the partially completed heads, plus its usual mark-up, and also the cost of the raw castings, plus a handling charge.

The amount to be recovered is to be determined in the light of the restrictions on the use and disposition of the property requisitioned. At the time these heads were requisitioned there was in effect Supplementary Conservation Order M–1–i, issued by the War Production Board under the powers conferred by the so-called Priorities Act, Act of June 28, 1940, 54 Stat. 676, as amended by the Act of May 31, 1941, 55 Stat. 236, and as further amended by the Act of March 27, 1942, 56 Stat. 176, 50 U.S.C.A.Appendix, § 1151 et seq. There was also in effect at this time General Limitation Order L–91 issued by the War Production Board. Under these orders plaintiff was prohibited from further processing the raw castings and the partially completed ones, and it was prohibited from using the completed heads in the manufacture of laundry or dry-cleaning or pressing machines. It, however, was permitted to sell the completed heads to replace worn or defective heads on machines previously sold by it. Specific authority to this effect was granted by the War Production Board on March 13, 1942 authorizing plaintiff—

* * * to use 5,000 pounds of aluminum castings which you have on hand for the purpose of replacing, maintaining, and repairing of present equipment now in the hands of your customers, with the understanding that you will obtain from your customer an equal weight of similar defective aluminum parts.

The 5,000 pounds which you have received authorization to use is to be maintained by you as a revolving inventory of repair parts, replacing this inventory as shipments are made to your customers.

Of the 596 heads requisitioned by the defendant 252 were heads for models of its machines the manufacture of which had been discontinued in 1934. The balance were heads for current models. Concerning these 252 heads plaintiff stated to the War Production Board: * * * we would be willing to sell at scrap prices, i. e., your offering price, our castings which can be used only on obsolete models or on models as to which there is little call for replacement; but this was on condition that they should be permitted to retain the balance of their inventory. However, later developments showed that these heads were not altogether obsolete. In 1945 plaintiff disposed of 17 of them for replacement purposes. Over a five-year period only

about 14 heads a year for all models had been sold for replacement purposes. This was a negligible demand. These so-called obsolete heads could be used for replacement purposes only. They were worth but little more than the price for scrap. The testimony shows that this price was about 10 cents a pound. The program price was 13½ cents a pound. We think plaintiff would be justly and fairly compensated for these heads by the payment of this program price. The total weight of these heads was 15,888 pounds. At 13½ cents a pound, plaintiff would be entitled to recover $2,144.88.

Plaintiff can hardly complain at this amount 98 percent of the holders of aluminum in this country voluntarily turned over to the Government 96 percent of their holdings of aluminum at this price. Of the 17,526,000 pounds which the holders voluntarily sold to the Government at this price, 1,300,000 pounds were in the form of castings, the form of plaintiff's aluminum.

■ We are of opinion, however, that for the balance of the heads requisitioned plaintiff is entitled to demand more than the program price, notwithstanding the fact that 98 percent of the holders of aluminum in this country voluntarily turned over to the Government 96 percent of their holdings at this price. This action on their part did not establish a market. They were no doubt largely influenced by a patriotic desire to help the Government in the winning of the war. Plaintiff is not required under the Constitution to reduce the amount it is entitled to demand for its property by any discount for patriotism, however commendable it would be for it to do so.

These heads, even those for current models, had a very small value for replacement purposes, since over a five-year period, from 1940 to 1944, plaintiff only disposed of about 14 heads a year for this purpose, out of a stock of 676. However, their chief value was in what the defendant in its brief very aptly terms their "retention value."

■ We have heretofore held in Charles Kaiser et al. v. United States, 69 F.Supp. 588, 108 Ct. Cl. ——, Adler Metal Products Corp. v. United States, 71 F. Supp. 239, 108 Ct. Cl. ——, and Seven-Up Bottling Co. v. United States, 68 F. Supp. 735, 107 Ct. Cl. 402, that a plaintiff is entitled to recover the value of its property at the time of the requisition, irrespective of restrictions placed on its use and disposition, less the cost of carrying it until the restrictions are removed, which costs, of course, include interest on the value of the property, the expense of storage, insurance depreciation, obsolescence, etc.

■ While the Government, as we said in these cases, has the unquestioned right to impose restrictions on the use and disposition of property in times of war, nevertheless when it takes a person's property it must compensate him in the light of his right to retain his property, unless requisitioned until the restrictions on its use and disposition should be removed. If it is possible to ascertain the market value of the property at the time of the taking, a plaintiff is entitled to recover this value, less these carrying charges. This is what the defendant aptly calls "retention value."

■ Plaintiff says that the market value of its property is established by its so-called list prices. It says that such heads as it sold during the period of the restrictions were sold at these list prices, and that this establishes the market; but an examination of the exhibits filed in the case shows that this is not true. These heads were sold at various prices, sometimes at the list price, sometimes for more than the list price, and sometimes for considerably less than the list price. The exhibits also show that these list prices were ascertained by adding to the cost of the heads to the plaintiff of 202.4 percent. This is an unreasonable mark-up for the Government to have to pay on the requisition of this property; nor is plaintiff entitled to demand it, because it has failed to prove that it could realize such prices on the market. There is, however, no doubt about the fact that these heads did have a very substantial retention value, as evidenced by the fact that the year after restrictions were removed it manufactured 843 machines using these and other aluminum heads.

The proof shows that all of the completed heads requisitioned, including the

heads for the models discontinued in 1934, cost plaintiff $8,837.57. This includes the cost of the material, the cost of labor, shop overhead, and general overhead. The proof also shows that the cost of the partially completed heads, including the same items as above, was $15,620.09, and it shows that the cost of the raw castings was $1,519.81. This is a total of $25,977.47. This figure, however, includes the cost of heads for models discontinued in 1934 in the total sum of $10,788.08. Since we have held that plaintiff is entitled to recover for these heads only the program price of 13½ cents a pound, the amount of $10,788.08 must be deducted from the total of $25,977.47 to ascertain the cost of the remaining heads. This amount is $15,189.39.

In addition to its cost, plaintiff is entitled to recover a fair mark-up for profit and other expenses. From the total there must be deducted an estimated amount for carrying charges for the estimated period during which the restrictions would remain in effect. There is no testimony covering profit and other expenses and carrying charges, but we think it fair and equitable to conclude that one would about offset the other.

We are of opinion that under all the facts in the case plaintiff would be justly compensated by the payment to it of this cost of $15,189.39 for the heads for current models, and the program price for the models discontinued in 1934 in the amount of $2,144.88. This amounts to the total sum of $17,334.27. Of this amount $2,563.78 has already been paid, leaving a balance due of $14,770.49.

Plaintiff is also entitled to interest at four percent per annum on $17,334.27, from September 25, 1942 to August 10, 1943, the date it was paid the sum of $2,563.78, which amounted to $608.20, as compensation for delay in payment, and it is entitled also to interest at four percent per annum on the balance of $14,770.49 from August 10, 1943 to date of payment of this amount. Judgment will be entered in favor of the Pantex Manufacturing Corporation for $14,770.49, plus $608.20, interest at four percent per annum for the period stated, and plus also interest at four percent per annum on $14,770.49 from August 10, 1943, until date of payment. It is so ordered.

MADDEN, JONES, and LITTLETON, Judges, concur.

WHALEY, Chief Justice, took no part in the decision of this case.