**THOMPSON v. COMMISSIONER OF INTERNAL REVENUE.**

**COUSE v. COMMISSIONER OF INTERNAL REVENUE.**

Nos. 10927, 10928.

United States Court of Appeals
Third Circuit.

Argued Feb. 19, 1953.

Decided June 8, 1953.

Israel B. Greene, Newark, N. J. (Bernard Hellring, Newark, N. J., Warren J. Greene, Newark, N. J., on the brief), for appellants.

Cecelia H. Goetz, Washington, D. C. (Charles S. Lyon, Asst Atty. Gen. and Ellis

N. Slack, Sp. Assts. to Atty. Gen., on the brief), for appellee.

Before KALODNER, STALEY and HASTIE, Circuit Judges.

KALODNER, Circuit Judge.

These appeals involve certain government contracts, awarded to a corporation which later dissolved and whose principal stockholder paid a capital gains tax on the value of the contracts (estimated profits) in excess of his basis in the assets of the corporation and then contributed his interest to a partnership later formed. The question presented is whether the partnership may use the value of the contracts as thus determined as a basis for amortization deductions. The Tax Court held that it could not. 1952, 18 T.C. 361. Taxpayers petitioned this Court for a review of that decision.

The detailed facts are found in the Tax Court decision, supra, and may be summarized as follows:

Couse Laboratories, Inc., until its dissolution on October 31, 1942, was engaged in the manufacture of mobile machine shops and portable signal towers.[1] Couse, one of the two petitioning taxpayers, owned 1900 shares of stock and one Maud Dale owned or controlled the remaining 100 shares. Prior to its dissolution, the corporation had been awarded government contracts of $11,000,000 for the manufacture of its products for the Signal Corps and the Engineer Corps. The Engineer Corps contracts were made directly with the government. The Signal Corps, as a matter of expediency, placed its orders with Westinghouse Electric and Manufacturing Company, which manufactured the radar equipment, and required Westinghouse to buy the towers from Couse Laboratories, Inc.

The contracts held by the corporation reserved to the government and Westinghouse the right to terminate the contracts, subject to certain conditions.[2] They were

[1] It was a New Jersey corporation, incorporated on February 16, 1941.

[2] In the event of termination the government was obligated to pay the con-

awarded to the corporation because of the manufacturing "know-how" of Couse, who had personally developed and patented many of the features of his products. It was estimated as of October 31, 1942, that the completion of these contracts would result in a profit of $1,314,506.21.

Upon dissolution of the corporation, the contracts were not yet completed, and Couse paid a capital gains tax on his portion of the anticipated profits,[3] and contributed his 95 per cent interest in the contracts to a partnership subsequently formed by him and Thompson. Thompson was the son of Maud Dale, who, after dissolution, sold her interest to him,[4] and he in turn transferred it to the partnership[5] in consideration of a 5 per cent interest in the latter.

The partnership treated the estimate of the profits to be realized as the cost of the contracts to it. In computing its net income for the period ending November 30, 1942, $11,388.75 was deducted for the amortization of this cost; the balance of $1,303,117.46 was taken as a deduction for the fiscal year ending November 30, 1943. The Commissioner disallowed both deductions. This had the effect of decreasing the loss sustained by the partnership for the earlier period from $15,152.44 to $4,902.-45 and increasing its income for the later period from $91,000.52 to $933,303.31. Couse's share of the latter amount was $869,328.14 and Thompson's $63,975.17. On the basis of these figures the Commissioner

determined a tax deficiency against Couse of $502,027.12 and against Thompson of $38,276.98.

The Commissioner contends that the taxpayers herein received nothing of value from the corporation, because of the statutory interdiction against the transfer of government contracts, R.S. § 3737, 41 U.S.C.A. § 15, and the parallel restriction found in the contract between the corporation and Westinghouse. Having received nothing of value, says the Commissioner, taxpayers had no basis to recover through depreciation. This, in sum, was the decision of the Tax Court.

If the government had a right to annul these contracts under section 3737, such a right would of course have an effect on their fair market value, but in our view the transfer here involved does not come within the prohibition of section 3737 and the government therefore had no such right. That section states:

"No contract or order, or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party, and any such transfer shall cause the annulment of the contract or order transferred, so far as the United States are concerned. All rights of action, however, for any breach of such contract by the contracting parties, are reserved to the United States."

Preliminarily, it should be noted that although the language of the section is broad,

---

tractor the contract price of all materials completed, to reimburse the contractor for actual expenditures made with respect to the uncompleted portion, and to pay the contractor a profit on the uncompleted portion to be determined as provided in the contract.

3. In valuing the assets received upon dissolution, Couse included his proportionate share, 95 per cent, of the value assigned to the contracts, or $1,248,780.-90. He reported as a long term capital gain in 1942 the difference between the value of assets received, including this amount, and the cost of the stock to him. The Tax Court ruled that if the Commissioner should prevail herein, Couse's computations must be revised so as to "eliminate from his capital gain for that year

any value attributable to the war contracts."

4. To be paid out of his share of the profits to be earned by the partnership.

5. On October 31, 1942, a "supplemental agreement" to each of the contracts held by the corporation with the Engineer Corps was entered into between the United States, Couse Laboratories, Inc., and the partnership, under which Couse Laboratories, Inc., as the assignor, waived all rights against the United States; the partnership, as the assignee, assumed all rights and duties under the contract; and all parties agreed that the government would make all future payments to the assignees. Westinghouse executed written consent to the assignment on November 27, 1942.

many limitations have been engrafted upon it. It has never been applied blindly, but rather, in each case, the Court has looked to the *ratio legis* to see whether the assignment involved was "within the mischief which congress intended to prevent." Freedman's Savings & Trust Co. v. Shepherd, 1888, 127 U.S. 494, 505, 8 S.Ct. 1250, 1255, 32 L.Ed. 163.

The rationale of sections 3737 and 3477, 41 U.S.C.A. § 15, 31 U.S.C.A. § 203 (the prohibition against assignments of claims against the government) was judicially declared in Hobbs v. McLean, 1886, 117 U.S. 567, 576, 6 S.Ct. 870, 874, 29 L.Ed. 940 where the Court said:

> "They were passed in order that the government might not be harassed by multiplying the number of persons with whom it had to deal, and might always know with whom it was dealing until the contract was completed and a settlement made."

It has been held that the statute was meant to secure to the government the personal attention and services of the contractor; to render him liable to punishment for fraud or neglect of duty; and to prevent parties from acquiring mere speculative interests, Francis v. United States, 1875, 11 Ct.Cl. 638 and from thereafter selling the contracts at a profit to bona fide bidders and contractors, 1888, 19 Op.Atty.Gen. 187.

Accordingly, the statute has been held inapplicable where a partnership was formed prior to the acceptance of a bid submitted in the name of one of the partners;[6] where the transfer was in pursuance of a court order and thus by operation of law;[7] where personal performance was not involved;[8] where the subject matter was a patent,[9] or a leasehold interest whether the United States was lessee[10] or lessor;[11] where the transfer was to an executor or administrator,[12] and to a receiver.[13]

The parallel restriction against assignments of claims section 3477, has been likewise limited. It has been restricted in its application to voluntary assignments.[14] Transfers by operation of law;[15] assignments for the benefit of creditors;[16] and transfers by judicial order[17] are not within the statute. Nor does the statute apply to subrogees.[18] It has been held inapplicable to cases closely analogous to the case at bar, as for example, a transfer resulting from the consolidation[19] or the merger[20] of two corporations, or a distribution in kind to stockholders upon dissolution.[21] Where a claim against the United States was transferred from a corporation to partners who were the sole stockholders

6. Hobbs v. McLean, 1886, 117 U.S. 567, 6 S.Ct. 870, 29 L.Ed. 940; Field v. U. S., 1880, 16 Ct.Cl. 434.

7. 3 Dec.Comp.Gen. 623 (1924).

8. Chemicals Recovery Co. v. U. S., 1952, 103 F.Supp. 1012, 122 Ct.Cl. 166.

9. 4 Dec.Comp. 43 (1897).

10. 15 Dec.Comp. 195 (1908); 4 Dec.Comp. Gen. 193, (1924); 9 Dec.Comp.Gen. 72 (1929); Freedman's Savings & Trust Co. v. Shepherd, 1888, 127 U.S. 494, 8 S.Ct. 1250, 32 L.Ed. 163.

11. Digest Ops.J.Adv.Gen. (Supp.1931) 1130.

12. Digest Ops.J.Adv.Gen. (1912) 348–49.

13. 10 Dec.Comp. 159, 163 (1903); cf. Mills v. U. S., 1884, 19 Ct.Cl. 79.

14. United States v. Gillis, 1877, 95 U.S. 407, 24 L.Ed. 503.

15. Erwin v. United States, 1878, 97 U.S. 392, 24 L.Ed. 1065.

16. Goodman v. Niblack, 1881, 102 U.S. 556, 26 L.Ed. 229.

17. Price v. Forrest, 1899, 173 U.S. 410, 19 S.Ct. 434, 43 L.Ed. 749; New Rawson Corp. v. United States, D.C.Mass.1943, 55 F.Supp. 291.

18. United States v. Aetna Surety Co., 1949, 338 U.S. 366, 70 S.Ct. 207, 94 L. Ed. 171.

19. Seaboard Air Line R. v. United States, 1921, 256 U.S. 655, 41 S.Ct. 611, 65 L. Ed. 1149.

20. Consolidated Paper Co. v. United States, 1932, 59 F.2d 281, 75 Ct.Cl. 215. See also Pantex Pressing Mach. v. United States, 1947, 71 F.Supp. 859; 108 Ct.Cl. 724 (Ct.Cl.1947) (successor corporation).

21. Novo Trading Corp. v. Commissioner, 2 Cir., 1940, 113 F.2d 320.

of the corporation, and then the partnership was reincorporated, the transfer was held valid. Mitchell Canneries v. United States, 1948, 77 F.Supp. 498, 111 Ct.Cl. 228.

Thus it is clear that not every assignment comes within the prohibition of sections 3737 and 3477. What we have here is a change in business structure. Many of the cases above cited illustrate that such a change is not within the purview of section 3477, but analogous cases under section 3737 are sparse.

In Hollerbach v. United States, 1912, 47 Ct.Cl. 236, reversed on other grounds, 1914, 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898, a partnership entered into a contract with the government for repairs on certain dams. Before any work was done the two partners incorporated. Ninety per cent of the stock was issued to the partners and ten per cent to certain relatives. The contract was taken over by the corporation and was completed by the corporation under the direction of the two principal stockholders. The Court held, 47 Ct.Cl. at pages 242, 243, that there was no transfer within the meaning of section 3737, " * * * or, in fact * * * any transfer of interest in the contract whatsoever. The plaintiffs never relinquished the complete control and management nor any of the emoluments of the contract, and the work done by the corporation was not different in character or effect from that of any other employee." While the Supreme Court reversed on unrelated grounds its disposition clearly evidenced its approval of the ruling of the Court of Claims that the contract had not been voided under section 3737 by reason of its transfer by the partners to the corporation.

In the instant case, Couse had a 95 per cent interest in the corporation, and an identical interest in the partnership. It is undisputed that the contracts were awarded to the corporation because of the manufacturing "know-how" of Couse. Both the mobile machine shop and the mobile radar mount had been developed by him personally, and he had patented many of their features. It was he who induced the government to award the contracts to the cor-

poration, and despite any change in business form, it was he who supervised performance of the contract, just as in the Hollerbach case the partners supervised performance even after incorporation. The only real difference in the two cases is one which favors the taxpayers. Whereas in the Hollerbach case the government bargained for personal liability and gained nothing by the incorporation, in the instant case the government bargained for corporate liability, and by the change in business form gained personal liability of the partners as well.

The Commissioner urges that the difference of identity of the stockholders of the corporation and the members of the partnership indicates that this was more than a mere change of business form. But we have already noted that Couse was the dominant figure in both the corporation and the partnership. The ownership of the remaining five per cent was not a matter of concern to the government. Furthermore, although it was Thompson's mother who owned the remaining stock in the corporation, she was not active in the conduct of the business, and when she transferred her interest to her son he obtained some proprietary interest in a business in which he had been active all along. Clearly, if Thompson's mother had sold her stock to him *before* dissolution respondents could not claim there had been an assignment. Looking to the substance of the transaction, we fail to see why it should be treated differently because it took place afterwards. And on this score the facts in the Hollerbach case are identical, for there 10 per cent of the corporate stock was owned by persons other than the original partners.

It has been said: "Changes in corporate structure or identity, however, constitute a formidable source of potential conflict with Section 3737. * * * The effect here to be given to Section 3737 depends upon whether courts * * * will mechanically define 'transfer' in terms of mere change of legal identity, or will pragmatically test each situation by the extent to which the change deprives the Government of the particular management and

financial responsibility which rendered the contractor a responsible bidder." Note, 52 Harv.L.Rev. 296, 299, 300 (1938).

The latter approach is justified by authority and reason. In the instant case the change did not deprive the government of the management responsibility for which it bargained, and financially, it was in a better position after the change than before. Under the test laid down in Hobbs v. McLean, supra, the change did not multiply the number of persons with whom the government had to deal. Nor was there any speculative bidding involved here. In our view the transfer involved was not one within the purview of section 3737.

■ But even assuming, arguendo, that the transfer involved was within the purview of Section 3737, the undisputed facts of this case make the section inapplicable.

Taxation is an intensely practical matter, and, it deals with realities not semblances; with substance and not form, as we have pointed out in the past.[22]

In the instant case the record clearly establishes that on October 31, 1942, prior to the dissolution of the corporation, the War Department, acting through its proper officer (its Engineer Corps Contracting Officer) entered into a supplemental agreement with the corporation and the partnership to be formed, which effectively waived any then existing prohibition against the assignment here involved.

■ Section 3737 clearly does not act as a self-executing nullification in cases where government contracts are assigned, but merely enables the government at its option to annul assigned contracts.[23] Here the government not only did not exercise its option to annul, but on the contrary, assented to the assignment.[24]

The position of the Commissioner (subscribed to by the Tax Court) is certainly an anomalous one.

It amounts to this: the government, qua contracting party, by the supplemental agreement waived the provisions of Section 3737 (assuming they were applicable in this situation); the government, qua tax collector, despite such waiver, seeks to invoke the provisions of Section 3737 after the contract has been completed and the entire contract transaction is history.

No more need be said on that score.

For the reasons stated we are of the opinion that the Tax Court erred and must be reversed.

The Tax Court having ruled against the taxpayers because of its view with respect to Section 3737 did not deem it necessary "to consider whether unfilled contracts and orders such as those here involved would otherwise qualify as depreciable assets."

■ To what extent the speculative character of the contracts should affect their fair market value and whether the contracts otherwise qualify as depreciable assets[25] are issues the resolution of which involves questions of fact as well as of law. It is the function of the Tax Court to make that resolution initially.[26]

For the reasons stated the decision of the Tax Court will be reversed and the cause remanded with directions to proceed in accordance with this opinion.

22. Commissioner v. Pittsburgh & W. Va. Ry. Co., 3 Cir., 1949, 172 F.2d 1010, 1014; Paxson v. Commissioner, 3 Cir., 1944, 144 F.2d 772, 776.

23. Burck v. Taylor, 1894, 152 U.S. 634, 648, 14 S.Ct. 696, 38 L.Ed. 578; 1879, 16 Op. Atty.Gen. 278; 15 A.G. 235, 246 (1877); see Martin v. National Surety Co., 1937, 300 U.S. 588, 57 S.Ct. 531, 81 L.Ed. 822, involving section 3477.

24. Restatement, Contracts, Section 162.

25. Cf. United States v. Industrial Alcohol Co. v. Commissioner, 42 B.T.A. 1323, affirmed 2 Cir., 1943, 137 F.2d 511; Akers v. Commissioner, 1946, 6 T.C. 693.

26. See Hormel v. Helvering, 1941, 312 U. S. 552, 560, 61 S.Ct. 719, 85 L.Ed. 1037.