**UNITED INTERNATIONAL INVESTIGATIVE SERVICES, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 407–89C.**

United States Claims Court.

July 20, 1992.

Robert E. Deso, Washington, D.C., attorney of record, for plaintiff. Deso, Thomas & Rost, P.C., of counsel.

Jeffrey J. Bernstein, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant. David M. Cohen,

Director, and Thomas W. Petersen, Asst. Director, of counsel.

## OPINION

FUTEY, Judge.

This government contract case is before the court on defendant's motion to dismiss plaintiff's amended complaint for lack of subject matter jurisdiction. Plaintiff contracted with the United States to supply security services, and seeks compensation for expenses incurred in complying with various United States Department of Labor (DOL) wage determinations. In its motion, defendant asserts that plaintiff lacks privity of contract with defendant, and, accordingly, the court lacks jurisdiction over plaintiff's amended complaint. In addition, defendant contends that the court lacks jurisdiction over plaintiff's claim as it falls within the labor standards disputes provision of the contract. Plaintiff counters that the contract's general disputes provision governs its claim, and, consequently, the claim is properly before the court. For the reasons stated below, the court finds privity of contract between the parties, but, in accordance with the labor standards disputes provision of the contract, dismisses part of plaintiff's amended complaint for lack of subject matter jurisdiction.

### Factual Background

Plaintiff, United International Investigative Services (United International), is one of two closely held corporations whose existence factors into the issues presently before the court. The other corporation is United Security Unlimited, Inc. (United Security). Both were incorporated in the State of California—United Security on January 7, 1981, and United International on February 10, 1986. Mr. William J. Guidice (Guidice) was the president and chief executive officer of both corporations.

On August 16, 1985, the United States Air Force (Air Force) issued an invitation for sealed bids on a contract to provide security services at New Boston Air Force Station, Amherst, New Hampshire. Performance was to begin on October 1, 1985, and run for a year, until September 30, 1986, with the Air Force receiving options to renew for fiscal years 1987, 1988, and 1989. However, the contract was not awarded until December 18, 1985, when United Security received Contract No. F19650–86–C0003. By modification entered into that same day, performance was to run from January 1, 1986 until October 1, 1986.

The contract was subject to the Service Contract Act of 1965 (SCA), 41 U.S.C. §§ 351–58, and incorporated a DOL wage determination that prescribed minimum hourly wage rates and fringe benefits for certain classes of service employees. See 29 C.F.R. § 4.3. The contract also contained a Performance Work Statement (PWS), which described in detail the services to be performed under the contract and established minimum qualifications for the various personnel required by the contract.

In a letter dated January 27, 1986, Guidice informed the Air Force contracting officer (CO) that he had been advised that all contract personnel must have at least 2 years of experience as a police officer. This requirement conflicted with Guidice's reading of the contract. Guidice interpreted the contract to prescribe a minimum of 2 years of experience as a security officer, not as a police officer. If police officer experience was required, Guidice concluded, the DOL wage determination would have to be conformed to reflect this requirement.

In a modification issued January 29, 1986, the Air Force incorporated a revised DOL wage determination into the contract. This wage determination superseded the previous one and raised the wages plaintiff was required to pay its employees. The wage determination, however, was not conformed to reflect the requirement of 2 years experience as a police officer.

On April 16, 1986, United Security entered into a name change agreement with the Air Force. The agreement provided in relevant part:

> (2) United Security Unlimited, Inc., by an amendment to its certificate of incorporation, dated February 10, 1986

has changed its corporate name and address to United International Investigative Services, 1535 East Orangewood Avenue, Suite 213, Anaheim, California 92805.

(3) This amendment accomplishes a change of corporate name and address only and all rights and obligations of the government and of the Contractor under the contracts are unaffected by this change.

(4) Documentary evidence of this change of corporate name and address has been filed with the government (See attached Articles of Incorporation).

Accordingly, the parties agreed to substitute the name of plaintiff, United International, for the name of United Security wherever United Security's name appeared in the contract.

On May 12, 1986, the parties entered into a modification adjusting the contract price to account for the increased wages required by the revised wage determination. A day later, the name change agreement was incorporated into the contract by modification dated May 13, 1986. Pursuant to modification of September 26, 1986, the Air Force exercised its option to renew for fiscal year 1987, extending the contract until September 30, 1987.

In a letter dated October 23, 1986, James F. Blake, plaintiff's contract manager and chief of police, advised the DOL that the current wage determination was inadequate. Blake claimed that the wage determination did not properly reflect either the qualifications required for employment under the contract or the duties performed.

According to plaintiff, it negotiated a collective bargaining agreement with its employees in December 1986. Pursuant to the agreement, plaintiff undertook to pay its employees significantly higher wages and provide greater fringe benefits. In a letter to the CO dated February 4, 1987, plaintiff acknowledged that the DOL had notified it of labor law violations and suggested replacing the current wage determination with the proposed collective bargaining agreement.

On June 9, 1987, the DOL provided the CO a conformed wage determination. This determination targeted employees required under the contract, but not listed in the current wage determination, establishing new classifications of service employees and corresponding wage rates. The employee classifications and wage rates virtually mirrored those set forth in plaintiff's proposed collective bargaining agreement. The DOL explained that the conformed wage determination was to be applied retroactively to the beginning of contract performance. In August 1987, the DOL issued a conformed wage determination establishing fringe benefits for the classes of service employees set forth in the June 9, 1987, conformed wage determination. These fringe benefits were also to be provided retroactively.

In a letter dated September 18, 1987, the CO informed plaintiff that the Air Force would not exercise its option to renew the contract for fiscal year 1988. Accordingly, as of October 1, 1987, plaintiff's contractual relationship with the Air Force would be at an end. In that letter, the CO also advised that, at the request of the DOL, all future payments under the contract would be suspended. The suspension was to last until the DOL determined the amount of back wages plaintiff owed its employees pursuant to the conformed wage determinations.

On October 13, 1987, plaintiff authorized the DOL to make payment to its current and former employees in the amount of $300,672.54. In a modification issued November 5, 1987, the conformed wage determinations were incorporated into the contract and the contract price adjusted accordingly. Because of the suspension of payments under the contract, however, plaintiff did not receive any additional monies. In a letter dated November 24, 1987, the DOL instructed the CO to transfer $300,572.54 to the DOL for the payment of back wages. In that letter, the CO was informed that no further withholding of monies was necessary.

Plaintiff submitted a properly certified claim dated April 29, 1988, to the CO, seek-

ing compensation for the increased wages it was required to pay its employees. By final decision of October 20, 1988, the CO denied plaintiff's claim.

On July 27, 1989, plaintiff timely filed a direct access appeal from the CO's final decision under the Contract Disputes Act of 1978 (CDA), 41 U.S.C. § 609(a)(1). In its amended complaint of March 14, 1991, plaintiff seeks compensation of $657,-185.65, which it allegedly paid its service employees in increased wages.

Defendant filed a motion to dismiss on July 26, 1991. Defendant alleges that plaintiff lacks privity of contract with the government and, accordingly, the court lacks subject matter jurisdiction over plaintiff's amended complaint. In support of its allegations, defendant avers that plaintiff is not the successor-in-interest to United Security, but a separate corporate entity. Therefore, defendant maintains, the modification of May 13, 1986, was ineffective in transferring the contract to plaintiff. Further, under 41 U.S.C. § 15, any attempt to transfer the contract would render the contract void as far as the government was concerned. Finally, defendant contends that an implied-in-fact contract never arose as the CO was at all times under the mistaken belief that plaintiff was the successor-in-interest to United Security. This mistake precluded the meeting of the minds necessary for an implied-in-fact contract.

In response, plaintiff asserts that it is, in fact, the successor-in-interest to United Security, and, therefore, the May 13, 1986, modification was effective. In addition, plaintiff alleges that an implied-in-fact contract arose from the actual circumstances and dealings of the parties. Finally, plaintiff proffers theories of ratification and estoppel.

■ At the court's request, the parties briefed whether plaintiff's claim arises out of the contract's labor standards provisions, and, under the labor standards disputes provision of the contract, lies outside the court's jurisdiction.[1] In their briefs, the parties took opposite positions, defendant contending that the complaint should be dismissed for lack of subject matter jurisdiction and plaintiff arguing to the contrary. Plaintiff further asserted that, in accordance with § 10(a)(1) of the CDA, the labor standards disputes provision does not serve to divest the court of jurisdiction over claims arising out of the labor standards provisions.

### Discussion

■ In a motion to dismiss for lack of jurisdiction, the facts alleged in the complaint are considered to be correct. "If these facts reveal any possible basis on which the non-movant might prevail, the motion must be denied." *W.R. Cooper Gen. Contractor, Inc. v. United States*, 843 F.2d 1362, 1364 (Fed.Cir.1988) (*citing Scheur v. United States*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974)).

### I.

■ A. Defendant alleges that plaintiff acted as the subcontractor for United Security and as such lacks privity to advance a claim directly in this court. *See United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1550 (Fed.Cir.1983). However, there is no evidence to suggest that plaintiff and United Security had any kind of contractual understanding. Instead, the facts indicate that on executing the name change agreement, plaintiff assumed all contractual duties, dealing directly with defendant in its own name as the prime contractor throughout the course of performance. In these circumstances, the relevant inquiry is into the validity of the contract's transfer.

■ B. The Anti-Assignment Act, 41 U.S.C. § 15, and the Assignment of Claims Act, 31 U.S.C. § 3727, respectively, prohibit the transfer of government contracts and the assignment of claims against the government. Any such transfer or assignment annuls the contract or voids the claim as

---

1. This court is obligated to determine its own jurisdiction. *Hambsch v. United States*, 857 F.2d 763, 764–65 (Fed.Cir.1988), *cert. denied*, 490 U.S. 1054, 109 S.Ct. 1969, 104 L.Ed.2d 437 (1989).

far as the government is concerned.[2] However, these statutes should not be strictly construed, but applied pragmatically with a view to effectuating the purposes underlying the statutes. *Tuftco Corp. v. United States*, 222 Ct.Cl. 277, 285, 614 F.2d 740, 744–45 (1980); *e.g.*, *Thompson v. Commissioner*, 205 F.2d 73, 76 (3d Cir.1953).

■ The statutes have consistently been recognized to have two purposes—to prevent fraud and to avoid multiple litigation. In *Tuftco Corp.*, the court elaborated on these purposes as follows:

> The statutes serve two purposes. They are primarily intended "to prevent persons of influence from buying up claims against the United States, which might then be improperly urged upon officers of the Government" [citation omitted]. Second, it is inferred Congress sought to enable the United States "to deal exclusively with the original claimant instead of several parties," thereby eliminating the confusion of conflicting demands for payment and the chances of multiple liability. [Citation omitted.]

222 Ct.Cl. at 285, 614 F.2d at 744; *accord Patterson v. United States*, 173 Ct.Cl. 819, 823, 354 F.2d 327, 329 (1965). Further, the statutes enable the government to obtain the contractor's personal attention and services, and render the contractor liable for fraud or neglect of duty. *Thompson*, 205 F.2d at 76; *Chemicals Recovery Co. v. United States*, 122 Ct.Cl. 166, 193–94, 103 F.Supp. 1012, 1018 (1952).

■ Accordingly, where these purposes are not impinged, a transfer should be allowed to stand. Thus, a transfer should be upheld when the government recognizes it either expressly as by novation or implicitly as by ratification or waiver. In addition, transfers occurring by operation of law are exempt from the statutes application. *Tuftco Corp.*, 222 Ct.Cl. at 285–86, 614 F.2d at 744–45. Among transfers occurring by operation of law are transfers to the contractor's successor-in-interest. *E.g.*, *Thompson*, 205 F.2d at 77–78; *Pantex Pressing Mach. Co. v. United States*, 108 Ct.Cl. 735, 747, 71 F.Supp. 859, 860–61 (1947). *See also Tuftco Corp.*, 222 Ct.Cl. at 285, 614 F.2d at 745.

■ As defendant correctly points out, the execution of the name change agreement was ineffective in achieving a novation under Federal Acquisition Regulation 42.1204. However, this defect does not necessarily preclude an effective transfer of the contract from United Security to plaintiff. *E.g.*, *Tuftco Corp.*, 222 Ct.Cl. at 286, 614 F.2d at 745. Thus, the issue before the court is whether the contract's transfer was otherwise prohibited under 41 U.S.C. § 15.

To this end, defendant avers that plaintiff is a corporate entity separate from United Security, and, therefore, under 41 U.S.C. § 15, the transfer of the contract from United Security to plaintiff was void. In support of its contention, defendant has produced a "Statement by Domestic Stock Corporation" filed by United Security on February 9, 1987. From this statement, defendant infers that United Security continued to exist at least approximately 10 months after it had allegedly changed its name to United International. Therefore, defendant avers, plaintiff could not have been United Security's successor-in-interest.

■ The mere legal existence of two corporations at the time of the contract's transfer does not automatically invalidate the transfer. Instead, the relevant inquiry is whether one corporation is, in fact, the successor-in-interest of the other. *Pantex Pressing*, 108 Ct.Cl. at 747, 71 F.Supp. at 860–61; *Novo Trading Corp. v. Commissioner*, 113 F.2d 320, 322 (2d Cir.1940). Further, the successor corporation must re-

---

**2.** Both statutes contain exceptions designed to help government contractors secure financing for performing government contracts. *Produce Factors Corp. v. United States*, 199 Ct.Cl. 572, 579–80, 467 F.2d 1343, 1347–48 (1972). None of the exceptions apply to the present case. In addition, as "the concerns of the two statutes and the legal concepts involved in their applicability are the same," cases arising under 31 U.S.C. § 3727 apply equally to cases arising under 41 U.S.C. § 15, and vice versa. *Tuftco Corp. v. United States*, 222 Ct.Cl. 277, 284 n. 4, 614 F.2d 740, 744 n. 4 (1980).

tain the same management and financial resources that its predecessor possessed. *Thompson*, 205 F.2d at 77–78; *Yates & Patterson, Inc.*, IBCA No. 1382–8–80, 81–1 BCA ¶ 14,825, 1980 WL 2424. The retention of these resources adequately ensures that the government continues to receive the benefit of the management and financial responsibility for which it bargained. *Thompson*, 205 F.2d at 78.

In the instant case, defendant has produced evidence only that United Security continued to exist in some form after the May 13, 1986, modification incorporated the name change agreement into the contract. This evidence fails to establish that plaintiff is not, in fact, the successor-in-interest of United Security, but merely raises that as a possibility. To this end, no evidence has been cited indicating that United Security continued to transact business after the May 13, 1986, modification was executed. However, plaintiff has consistently maintained in correspondence, its claim before the CO, and its complaints before this court that it is the successor corporation to United Security. Absent any competent proof to the contrary, plaintiff's allegations that it is the successor-in-interest of United Security must stand. *See Hamlet v. United States*, 873 F.2d 1414, 1416–17 (Fed.Cir. 1989); *W.R. Cooper*, 843 F.2d at 1364.

As plaintiff was the successor to United Security, the government was not subjected to multiple obligations; nor did it lose control over the contractor as plaintiff, by operation of law, stepped into the shoes of United Security. In addition, the government continued to receive the benefit of Guidice's management expertise after the contract's transfer. Guidice continued as president and chief executive officer of plaintiff. The correspondence between plaintiff and defendant indicates that Guidice continued to supervise the contract. Moreover, there is no evidence that on assuming the contract, plaintiff changed the security personnel at the Air Force base in any manner. Financially, after plaintiff succeeded United Security, the government was in just as good a position as when it dealt with United Security. Significantly, no evidence has been cited indicating that

United Security's assets were stripped before being transferred to plaintiff. Therefore, while dealing with plaintiff, the government continued to receive the benefit of the management and financial responsibility originally bargained for in contracting with United Security.

Finally, no evidence has been produced that defendant was otherwise prejudiced by the contract's transfer. The contract proceeded until completion, and indeed the government executed an option to renew the contract for another year. The contract was not terminated until September 30, 1987, at the end of the performance of the option year, and was terminated for the convenience of the government. In short, plaintiff has alleged facts sufficient to establish that the transfer of the instant contract did not fall within the prohibition in 41 U.S.C. § 15.

## II.

■■■■ Assuming *arguendo* that the transfer of the contract from United Security to plaintiff fell within the ambit of 41 U.S.C. § 15, the voiding of that contract did not automatically nullify the further dealings between plaintiff and defendant. *Heathfield v. United States*, 8 Ct.Cl. 213, 216 (1872); *Wheeler v. United States*, 5 Ct.Cl. 504, 509 (1869). Instead, the nature and extent of these dealings must be established to determine whether an implied-in-fact contract arose.

In this case, plaintiff and defendant, with the approval of the CO, fully carried out the contractual obligations embodied in the contract between United Security and defendant. In similar circumstances, courts have found that an implied-in-fact contract for a *quantum meruit* arose. *E.g., United States v. Amdahl Corp.*, 786 F.2d 387, 393 (Fed.Cir.1986); *New York Mail & News. Transp. Co. v. United States*, 139 Ct.Cl. 751, 759, 154 F.Supp. 271, 276, *cert. denied*, 355 U.S. 904, 78 S.Ct. 332, 2 L.Ed.2d 260 (1957); *Tidewater Coal Exch., Inc. v. United States*, 67 Ct.Cl. 590, 600 (1929).

■ Defendant maintains that an implied-in-fact contract is precluded as there was never a meeting of the minds. Defendant contends that throughout the course of dealing between the parties, defendant mistakenly believed it was dealing with United Security, not plaintiff, and, accordingly, defendant never agreed to contract with plaintiff. As the basis for its contention, defendant relies on the April 16, 1986, name change agreement, in which plaintiff claimed that it was the successor to United Security.

■ Defendant's misapprehension did not preclude the existence of an implied-in-fact contract. Actual mental assent is not required for the formation of an implied-in-fact contract for a *quantum meruit*. *Goltra v. United States*, 119 Ct.Cl. 217, 251–52, 96 F.Supp. 618, 623 (1951); *Restatement (Second) of Contracts*, § 19(3) cmt. d (1980). *See WPC Enters., Inc. v. United States*, 163 Ct.Cl. 1, 11, 323 F.2d 874, 879 (1963); *e.g., Buffalo & Fort Erie Pub. Bridge Auth. v. United States*, 106 Ct.Cl. 731, 65 F.Supp. 476 (1946). Instead, "[b]efore a contract may be implied-in-fact, there must be a meeting of the minds *which is inferred from the conduct of the parties*, and in the light of the surrounding circumstances, shows their tacit understanding." [Emphasis added.] *Somali Dev. Bank v. United States*, 205 Ct.Cl. 741, 751, 508 F.2d 817, 822 (1974). In this case, a meeting of the minds can be inferred from the parties' conduct in fully performing the contract between defendant and United Security.

■ The contract, however, is rendered voidable by defendant's misapprehension as to the party with whom it contracted. Assuming that plaintiff is not the successor-in-interest of United Security, plaintiff's representations in the name change agreement amounted to a material misrepresentation of fact. *See Restatement (Sec-*

*ond) of Contracts* § 162(b). The consequences of such a misrepresentation during contract formation have been explained as follows:

> A party who has been induced to enter into a contract by a material misrepresentation of fact has the option of either ratifying or avoiding the contract at his election. If he ratifies it, he may properly insist upon the benefits of the bargain; if he rescinds, he is entitled to repudiate all of the contract provisions and to be restored to the status quo ante. [Citations omitted.]

*Pacific Architects & Eng'rs., Inc. v. United States*, 203 Ct.Cl. 499, 513, 491 F.2d 734, 742 (1974). Thus, a misrepresentation as to the identity of a party does not render a contract void, but rather voidable. *Accord Restatement (Second) of Contracts* § 163 cmt. a. Until the contract is rescinded, however, the parties continue to owe each other contractual obligations. *Id.* § 7 cmt. e. Moreover, "[w]hen an individual or the Government rescinds a contract, the parties are to be placed, as far as possible, in the position they would have occupied without the transaction." *Dahl v. United States*, 695 F.2d 1373, 1382 (Fed.Cir.1982) (*quoting New York Mail & News.*, 139 Ct.Cl. at 759, 154 F.Supp. at 276).

■ In short, assuming that plaintiff is not the successor-in-interest to United Security, plaintiff has made an adequate showing of an implied-in-fact contract that arose because of plaintiff's honest misrepresentation. Defendant has neither provided evidence of fraud nor alleged such.[3] Plaintiff and defendant have fully performed a contract to provide security services, treating each other as contracting equals throughout their endeavor. There is no evidence that defendant was prejudiced or damaged by the misrepresentation. In these circumstances, an implied-in-fact contract for a *quantum meruit* arose.[4]

---

**3.** If the misrepresentation was in fact made in bad faith, plaintiff is precluded from recovering on an implied-in-fact contract. *United States v. Amdahl Corp.*, 786 F.2d 387, 395 n. 8 (Fed.Cir. 1986); *see J.E.T.S., Inc. v. United States*, 838 F.2d 1196, 1200 (Fed.Cir.), *cert. denied*, 486 U.S. 1057, 108 S.Ct. 2825, 100 L.Ed.2d 926 (1988).

**4.** As plaintiff has alleged facts sufficient to establish the existence of an implied-in-fact contract between the parties, plaintiff's alternative theories of ratification and estoppel will not be addressed.

### III.

Plaintiff's claim consists of three counts of recovery. In Counts I and II, plaintiff seeks compensation for expenses incurred in complying with the first revised wage determination and with the conformed wage determinations. In Count III, plaintiff seeks to recover funds withheld by the DOL.

According to defendant, each count of plaintiff's claim arises out of the contract's labor standards provisions and, under the labor standards disputes provision of the contract, is not subject to the court's jurisdiction. Plaintiff counters that § 10(a)(1) of the CDA guarantees the court jurisdiction over each count, notwithstanding the labor standards disputes provision of the contract. Alternatively, plaintiff maintains that each count gives rise to a dispute between the parties to the contract, and, pursuant to the general disputes clause of the contract, the court has jurisdiction over each count.

■ A. Plaintiff asserts that § 10(a)(1) of the CDA confers jurisdiction on the court to hear all matters raised by a contractor in a direct action brought in this court. Section 10(a)(1) provides, in part, that "a contractor may bring an action directly on [its] claim in the United States Claims Court, notwithstanding any contract provision, regulation, or rule of law to the contrary." 41 U.S.C. § 609(a)(1). Plaintiff contends that the phrase "notwithstanding any contract provision, regulation, or rule of law to the contrary" nullifies the effect of the contract's labor standards disputes provision, which requires the DOL to resolve disputes arising out of the contract's labor standards provisions.

Plaintiff's interpretation of § 10(a)(1) of the CDA is inconsistent with the plain meaning of the section, the congressional intent underlying the section, and the statutory scheme for resolving contractual disputes. First, § 10(a)(1), on its face, is inapplicable to the review of DOL decisions. Section 10(a)(1) provides that a contractor may bring an action directly in court "in lieu of appealing the decision of the contracting officer ... to an agency board."

Section 2(6) of the CDA defines "agency board" as "an agency board of contract appeals established under [the CDA]." 41 U.S.C. § 601(6). The DOL's administrative procedures, however, are not established under the CDA. See, e.g., 41 U.S.C. § 353 (providing the DOL authority to enforce the SCA). Therefore, the entities within the DOL responsible for reviewing DOL decisions are not agency boards within the meaning of § 10(a)(1). As a result, § 10(a)(1) does not apply to the review of DOL decisions.

Moreover, in accordance with the SCA, the CO lacks authority to render a decision on a dispute arising out of the labor standards provisions of the contract. Section 10(a)(1), however, is geared to ensuring the availability of court review of the CO's decision. Absent any potential for such a decision, § 10(a)(1) cannot be said to apply to DOL decisions.

■ Plaintiff's interpretation is also inconsistent with congressional purpose in enacting § 10(a)(1). As indicated in the language of § 10(a)(1), Congress promulgated that section to ensure contractors direct access to court as an alternative to appealing the CO's decision to the appropriate agency board of contract appeals. The need for such a provision resulted from the numerous pre-CDA contract provisions, regulations, and court decisions requiring contractors to apply for relief first to the agency boards of contract appeals before bringing an action in court. See S.Rep. No. 1118, 95th Cong., 2d Sess. (1978); H.R. No. 1556, 95th Cong., 2d Sess. (1978), U.S.Code Cong. & Admin.News. 1978, p. 5235. In light of the purpose behind § 10(a)(1), the above phrase from § 10(a)(1) should be interpreted as applying only to contract provisions, regulations, and court decisions that require application to the agency boards of contract appeals as a pre-requisite to a court action.

Finally, plaintiff's interpretation of § 10(a)(1) of the CDA is incompatible with Congress's broad grant of authority to the DOL to enforce the SCA. The language of the SCA and its legislative history indicate that Congress intended the DOL to be the

sole arbiter of disputes arising out of the labor standards provisions. 41 U.S.C. §§ 351–58; S.Rep. 798, 89th Cong., 2d Sess. (1965), *reprinted in* 1965 U.S.C.C.A.N. 3737. Interpreting the above phrase in § 10(a)(1) as nullifying the labor standards disputes provision would defeat congressional intent in promulgating the SCA. This is impermissible. *See Horner v. Jeffrey*, 823 F.2d 1521, 1527–28 (Fed.Cir.1987).

In short, the phrase relied on by plaintiff cannot be interpreted to nullify the labor standards disputes provision of the instant contract. Accordingly, plaintiff's argument must fail.

■■■ B. The contract at issue incorporated the following labor standards disputes provision, as set forth in Defense Acquisition Regulation (DAR) 7–1903.41(a):

> *Disputes Concerning Labor Standards.* Disputes arising out of the labor standards provisions of this contract shall not be subject to the general disputes clause of this contract. Such disputes shall be resolved in accordance with the procedures of the Department of Labor set forth in 29 CFR Parts 4, 6, and 8. Disputes within the meaning of this clause include disputes between the contractor (or any of its subcontractors) and the contracting agency, the U.S. Department of Labor or the employees or their representatives.

This provision renders the CDA inapplicable to disputes arising out of the labor standards provisions. Such disputes fall within the exclusive jurisdiction of the DOL. *Emerald Maintenance, Inc. v. United States*, 925 F.2d 1425, 1428 (Fed. Cir.1991). However, to the extent that a labor-related dispute centers on the parties' mutual contract rights and obligations, the DOL is not vested with exclusive jurisdiction over the dispute. *Aleman Food Servs., Inc. v. United States*, 25 Cl.Ct. 201, 207 (1992) (citations omitted); *Burnside-Ott Aviation Training Center, Inc. v. United States*, 24 Cl.Ct. 553, 557 (1991) (citations omitted), *appeal docketed*, No. 92–5034 (Fed.Cir. December 12, 1991); *Emerald Maintenance, Inc.*, ASBCA Nos. 36628 & 36632, 88–3 BCA ¶ 21,103, at 106,-

532 (citations omitted), *aff'd*, 925 F.2d 1425 (Fed.Cir.1991). Therefore, at issue is whether plaintiff's claim arises out of the labor standards provisions. *Emerald Maintenance*, 925 F.2d at 1428.

■■■ C. In Count I of its amended complaint, plaintiff seeks compensation for wage increases that were not covered by the May 12, 1986, modification. In that modification, the parties sought to compensate plaintiff for expenses incurred in complying with the January 29, 1986, modification, which incorporated the first revised wage determination into the contract. According to plaintiff, the revised wage determination raised the minimum hourly rates required under the contract from $6.43 to $6.69. Plaintiff alleges that it was reimbursed for only $0.20 of the $0.26 hourly increase. As a result, plaintiff claims a total due of $17,783.63.

Defendant contends that Count I should be dismissed since it relates to the wage determination originally incorporated into the contract. Defendant maintains that any errors in that wage determination concern matters solely within the province of the DOL. In this respect, defendant is correct. To the extent Count I is based on defects in the wage determination originally incorporated into the contract, the court lacks jurisdiction to hear plaintiff's claim. *Emerald Maintenance, Inc. v. United States*, 925 F.2d 1425, 1429 (Fed.Cir.1991). Thus, the allegations in Count I that defendant misrepresented the wages to be paid service employees give rise to a dispute within the exclusive jurisdiction of the DOL. However, the allegations concerning misrepresentation do not form the whole basis for plaintiff's claim in Count I. Plaintiff also alleges that it was not fully reimbursed by the May 12, 1986, modification for the expenses incurred in complying with the January 29, 1986 modification. These allegations must be examined to determine whether they give rise to a dispute arising out of the labor standards disputes provision.

On examination, plaintiff's allegations generate a dispute that does not arise out of the labor standards provisions. In

Count I, plaintiff is ultimately questioning the parties' mutual contract rights and obligations. The real dispute between the parties concerns the adequacy of the May 12, 1986, modification. That modification was issued under the Fair Labor Standards Act and Service Contract Act price adjustment clause of the contract. *See* DAR 7–1905(b). To comply with this clause, the government must compensate the contractor for increases in wages and fringe benefits resulting from an increased wage determination applied to the contract by operation of law. Thus, the issue in Count I is one of contract interpretation—that is, whether the contract's price adjustment clause provides for the recovery of the compensation plaintiff claims is owing. Significantly, neither party ever disputed the validity of the first revised wage determination or its application to plaintiff's employees. Instead, the dispute concerns which party bears the risk of the increase in the contract's cost. This matter does not lie within the particular expertise of the DOL, but rather falls within the court's province. The court, therefore, has subject matter jurisdiction over those portions of Count I related to the adequacy of the May 12, 1986, modification. *Aleman,* 25 Cl.Ct. at 208–09.

■ D. In Count II, plaintiff seeks compensation for expenses incurred in complying with the conformed wage determinations. Plaintiff alleges that it was short-changed by the modification issued November 5, 1987. That modification incorporated the conformed wage determinations into the contract and adjusted the contract price accordingly. As a result, the contract price was increased by $601,493.13. Plaintiff maintains that it should have received an additional $1,095,808.80, for a difference owing by defendant of $494,315.67.

Defendant avers that Count II relates to the labor standards provisions of the contract, and any dispute concerning their application must be resolved pursuant to the labor standards disputes provision of the contract. Therefore, defendant concludes, the court lacks jurisdiction over Count II.

Defendant misconstrues the thrust of Count II. As in Count I, plaintiff advances a theory of misrepresentation while alleging that a contract modification was inadequate. Thus, plaintiff brings into question which party bears the risk of the increase in the contract's price occasioned by the November 5, 1987, modification. That modification was issued under the contract's price adjustment clause and sought to compensate plaintiff for the increased wages required by the conformed wage determinations. Whether plaintiff received its due in the November 5, 1987, modification is a question of contract interpretation properly resolved by the court, not the DOL. Therefore, the court has subject matter jurisdiction over this aspect of Count II. *Aleman,* 25 Cl.Ct. at 208–09.

In addition to questioning the adequacy of the November 5, 1987, modification, plaintiff advances a theory of misrepresentation that only indirectly involves the labor standards provisions. According to plaintiff, the need to conform the wage determination originally incorporated into the contract can be traced to misrepresentations in the contract's PWS. Plaintiff claims that the PWS, correctly interpreted, requires service employees to have civilian experience only as a security guard, not as a police officer. Plaintiff alleges that the original wage determination was consistent with this requirement. The wage determination had to be conformed only when defendant changed the minimum qualifications established by the PWS and required a minimum of 2 years experience as a civilian police officer.

Defendant counters that the applicable regulations and the contract placed the burden of properly classifying service employees on plaintiff and that such matters are reserved for decision by the DOL. 29 C.F.R. §§ 4.6, 4.55; DAR 7–1903.41(a); *see Collins Int'l Serv. Co. v. United States,* 744 F.2d 812, 815 (Fed.Cir.1984). Granted, plaintiff was responsible for properly classifying any employees required by the contract but not listed in the contract's wage determination. However, plaintiff's allegations do not concern the proper classification of service employees. In fact, plaintiff contends that the employees described in

the contract's PWS were properly classified in the original wage determination. Thus, defendant misinterprets plaintiff's allegations, which focus on whether the PWS misrepresented the employees required in performing the contract. As a result, defendant's argument is misplaced and, therefore, of no avail.

The dispute generated by plaintiff's misrepresentation allegations is properly before the court. Plaintiff does not contest the validity of the original wage determination. Rather, plaintiff points to defects in the PWS as giving rise to the dispute. Resolving this dispute involves matters of contract interpretation for the court. First, the court must determine whether the PWS misrepresented the minimum qualifications for service employees. If so, the court must then determine whether plaintiff is entitled to recover under the contract. Resolving these issues involves matters within the particular expertise of the court, not the DOL. *See Aleman*, 25 Cl.Ct. at 208–09. Moreover, the court is not required to examine the DOL's conduct or the substance of the labor standards provisions. *See Burnside–Ott*, 24 Cl.Ct. at 566. Accordingly, the court has subject matter jurisdiction to hear plaintiff's Count II misrepresentation claim. *See Emerald Maintenance*, 925 F.2d at 1429–30 (entertaining the merits of a contractor's mutual mistake claim).

█ E. In Count III, plaintiff contests the withholding of funds by the DOL. The DOL withheld roughly $300,000.00 from the price adjustment provided by the modification issued November 5, 1987. This amount was withheld to pay plaintiff's employees back wages. Plaintiff maintains that the DOL improperly withheld $145,086.35, asserting that the remainder of the funds withheld was sufficient to cover the back wages owed.[5]

In Count III, plaintiff claims that the DOL withheld more funds than necessary to remedy any underpayment. At issue is whether the DOL properly calculated the

back wages plaintiff owed its employees. Thus, the dispute centers on actions taken by the DOL, not on the parties' mutual contract rights and obligations. Moreover, the disputed actions were taken pursuant to the contract's labor standards provisions. DAR 7–1903.41(a). Any dispute generated by those actions arises out of the labor standards provisions and, in accordance with the contract's labor standards disputes provision, must be resolved by the DOL. *Emerald Maintenance*, 925 F.2d at 1429; *Burnside–Ott*, 24 Cl.Ct. at 561.

### Conclusion

For the foregoing reasons, defendant's motion to dismiss for lack of privity of contract is denied. Moreover, the court has subject matter jurisdiction to entertain Counts I and II of plaintiff's amended complaint. However, under the labor standards disputes provision of the contract, the court lacks subject matter jurisdiction over Count III of the amended complaint.

Accordingly, the clerk is directed to dismiss those portions of the complaint related to Count III. With respect to Counts I and II, the parties are directed to consult and then file a joint status report concerning further proceedings in this case by August 17, 1992.

---

**5.** Plaintiff concludes Count III by requesting an award of "$146,086.35." This figure appears to be a typographical error. Earlier in Count III

as well as in its claim before the Air Force contracting officer, plaintiff indicated that it seeks only $145,086.35.